UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JADIAN, INC.,

        Plaintiff / Counter-Defendant,

and

JADIAN ENTERPRISES, INC.,              CASE No. 1:17-cv-907

        Additional Counter-Defendant,      HON. ROBERT J. JONKER

v.

NATIONAL QUALITY ASSURANCE
USA, INC.,

        Defendant and Counter-Claimant.

_____/

## OPINION AND ORDER

### INTRODUCTION

Defendant National Quality Assurance USA, Inc. ("NQA") provides accredited certification, training and support services to its customers.  In this work NQA uses the Enterprise Quality Manager ("EQM") software, a mobile auditing program developed by Plaintiff Jadian, Inc.'s predecessor in interest, Jadian Enterprises.  In May of 2014, Jadian acquired the assets of Enterprises.  Jadian says it was willing and able to keep NQA as a customer, but NQA asserts Jadian was simply not up to the task of providing the support services necessary for NQA to run a successful business.  The parties' relationship deteriorated through that summer, culminating in NQA's acquisition of the EQM source code in September 2014, under an escrow agreement.

The parties have presented a series of contracts and proposed contracts as part of the record in this case.  Jadian's basic position is that Defendant NQA failed to live up to its side of the bargains and is using and adapting the EQM source code without authorization or payment.  NQA's basic position is that it was Jadian who failed to live up to its side of the bargain, forcing NQA to hire two of Jadian's predecessor's former employees and to secure release of the escrowed software source code to make things work.  NQA seeks summary judgment and also moves to strike Jadian's jury demand, citing a waiver provision in one of the agreements.  The Court grants the motion to strike the jury demand, and grants the summary judgment motion in part.  The contract claims of both parties must be tried to the Court because genuine issues of material fact preclude summary judgment, but the rest of the case can be disposed of as a matter of law.

## FACTUAL BACKGROUND

Jadian Enterprises ("Enterprises") developed the Enterprise Quality Manager ("EQM") software.[1]  This software "is a web-based solution that has mobile tools to enable administration bodies to manage compliance electronically, conduct audits and inspections, fulfill work orders, monitor licensing, certifications and permits, and check compliance enforcement."  *Enterprise Quality Manager*, JADIAN.COM,  https://www.jadian.com/Assurance-Suite/Enterprise-Quality-Manager (last visited Mar. 27, 2019).

National Quality Assurance, USA, Inc. ("NQA") was a customer of Enterprises and then of Plaintiff Jadian Inc.'s ("Jadian") after Jadian acquired Enterprises' assets.  "NQA provides quality and environmental management system registration and certification services.  NQA also provides process and product compliance services and support; contract audit services for supplier

---

[1] Enterprises is named in NQA's Amended Counterclaim along with Jadian.  (Am. Answer & Countercl., ECF No. 44, PageID.386).  Enterprises has not been served and has not appeared in the case.  It must be dismissed under FED. R. CIV. P. 4(m).

2

audits, as well as internal audits and consulting services."  (Nagel Decl. ¶ 12, ECF No. 58, PageID.735).  NQA uses the EQM software to assist it in this work.

### 1.  Enterprises enters into a series of ad hoc agreements with NQA

#### A.  _Project Services Agreement & Software License Agreements_

On April 8, 2008, Enterprises and NQA entered into a project services agreement ("PSA") relating to the EQM software.  (PSA, ECF No. 16).  As Jadian puts it, the PSA dealt with certain projects that Enterprises undertook for NQA in 2008 and 2009 pertaining to earlier versions of the EQM software.  By its terms, the PSA "set forth the terms and conditions under which [Enterprises] will provide [NQA] with project services related to [NQA's] use (or planned use) of [Enterprises'] Licensed Software Products" such as the EQM software.  (PSA Ex. A, § I, ECF No. 16, PageID.91).  The specific services were to be detailed in "individual Statements of Work," and eight separate Statements of Work were executed between the parties on the same day as the PSA.  (Statement of Work #1-8, ECF No. 16, PageID.99-121).  The scope of this work included services such as "Audit Status Flow" (Statement of Work #1); "Client Setup" (Statement of Work #2); "Certification Management" (Statement of Work #5); and "Dashboard Updates" (Statement of Work # 8).  Jadian contends that after 2009, there were no further work orders issued under the agreement.  (Jadian Br., ECF No. 95, PageID.1306-1307; Passley Decl. ¶ 4, ECF No. 98, PageID.1471).

In addition to these services, the PSA purports to incorporate a Software License Agreement ("SLA"). (PSA § IV(a), ECF No. 16, PageID.89).  NQA has filed what it says is the specific SLA that was incorporated.  That agreement, which is not signed, contains a "Revision Date" of June 10, 2007, and notes that it was "Revision: A."  (SLA Rev. A, ECF No. 15).  Under the provisions of the agreement as drafted, Enterprises granted NQA "a non-transferable, limited

and non-exclusive perpetual worldwide use to use the Licensed Software Products," defined elsewhere as the EQM software (version 2.0).  (SLA Rev. A, Ex. C § IIIa, ECF No. 15, PageID.84; SLA Rev. A. Ex. A, § I, ECF No. 15, PageID.80).  The total software license fee was "$N/A" which means, NQA says, NQA was not required to pay any license fees.  (SLA Rev. A, § II, ECF No. 15, PageID. 78).  Finally, the SLA required NQA to "notify [Enterprises] of any enhancements or modifications to the [EQM Software] made by" NQA.  (SLA Rev. A, Ex. B, § IIe, ECF No. 15, PageID.82).

 Jadian strongly disputes that the SLA was ever in effect.  It notes that no executed SLA appears in the record.  According to a declaration from Jerry Norris, Enterprises' President, the parties negotiated an SLA agreement between 2006 and 2010 but never came to a final meeting of the minds.  (Norris Decl. ¶ 4, ECF No. 108-1, PageID.1511).  Jadian's President, Shaun Passley, stated similarly that the SLA that NQA depends upon was only a draft, as demonstrated by the use of "N/A" as a placeholder for price terms.  (Passley Decl. ¶ 5, ECF No. 98, PageID.1471).  Indeed, Jadian says that the "Revision A" of the SLA was followed by several subsequent drafts, through at least "Revision F," which has a "Revision Date" of July 6, 2009, well after the PSA was executed.  (SLA Rev. F., ECF No. 95-1, PageID.1348).

The Court need not resolve the particulars of this dispute because the 2012 Master Subscription Agreement, discussed below, superseded the PSA and the SLA, even assuming without deciding that the SLA was ever in effect.

### B.  *Purchase Order 1334 & Three-Party Escrow Agreement*

On October 16, 2008, NQA presented a purchase order ("Purchase Order 1334") to Enterprises.  (Purchase Order 1334, ECF No. 85-9).  Kim Griggs, an Enterprises Vice President of Corporate Affairs, executed the agreement for Enterprises on October 23, 2008.  Among other

things, Purchase Order 1334 required Enterprises to deposit the source code for the EQM software with an escrow agent on a quarterly basis in exchange for NQA's payment to Enterprises of $200 per quarter.  Kim Griggs stated that because Enterprises was a new company, "NQA wanted assurances that it could get the source code if Jadian Enterprises ever filed for bankruptcy." (Griggs Decl. ¶ 7, ECF No. 96, PageID.1462).

As called for by that purchase order, Kim Griggs for Enterprises and Kevin Beard for NQA entered into a Three-Party Escrow Agreement ("Escrow Agreement") with Iron Mountain Intellectual Property Management, Inc. (Escrow Agreement, ECF No. 17).  Under the agreement (which was executed on December 1, 2008 by Iron Mountain) NQA could request that Iron Mountain release the EQM source code for, *inter alia*, Enterprises' breach of its agreements with NQA.  If NQA made such a request, Iron Mountain was required to provide a written notice of the request to Enterprises.  After ten days, if Enterprises did not provide contrary instructions, Iron Mountain was to release the EQM source code to NQA.  Exhibit C to the Escrow Agreement provided that NQA could then use the software "for the sole purpose of continuing the benefits afforded to [NQA] by the License Agreement."  (Escrow Agreement, Ex. C § 6, ECF No. 17, PageID.131).[2]  Section 12(h) of the Escrow Agreement also provided for notice to be sent to the last known address of the parties upon a request for the release of the source code:

> All notices regarding Exhibit C (release) shall be sent by commercial express mail or other commercially appropriate means that provide prompt delivery and require proof of delivery. All other correspondence, including invoices, payments, and other documents and communications, may be sent electronically or via regular mail. The Parties shall have the right to rely on the last known address of

---

[2] The term "License Agreement" was not separately defined in the Escrow Agreement.  However, the Introduction of the Escrow Agreement stated that NQA and Jadian "have, or will have, entered into a license agreement or other agreement conveying intellectual property rights to the Beneficiary, and the Parties intend this Agreement to be considered as supplementary to such agreement[.]"  (Escrow Agreement § 1(b), ECF No. 17, PageID.122).

the other Parties. Any correctly addressed notice to last known address of the other Parties that is relied on herein and that is refused, unclaimed, or undeliverable because of an act or omission of the Party to be notified as provided herein shall be deemed effective as of the first date that said notice was refused, unclaimed, or deemed undeliverable by electronic mail, the postal authorities by mail, through messenger or commercial express delivery services

(Escrow Agreement, § 12(h), ECF No. 17, PageID.125).

### 2.    Enterprises and NQA execute a Master Subscription Agreement

A little over three years later, on January 26, 2012, Enterprises and NQA entered into a Master Subscription Agreement ("MSA") when Jim Dozier, NQA's general manager, signed the agreement. (MSA, ECF No. 35-4). Kim Griggs stated in a declaration that the MSA related to NQA's use of version 3 of the EQM software.  Enterprises considered this to be a separate product from version 2 of the software.  (Griggs Decl. ¶¶ 10-11, ECF No. 96, PageID.1463).  According to Jadian, the MSA replaced the prior pricing model that the parties had been operating under with subscription pricing.  (ECF No. 95, PageID.1313).  The express terms of the MSA include a broad integration clause that says the MSA supersedes all prior agreements between the parties "concerning" the same subject matter, as more fully explained below.

Under the MSA, Enterprises agreed to provide basic support for "Purchased Services." (MSA § 3.1, ECF No. 35-4, PageID.340).  Those services were defined as "[s]ervices that [NQA] purchase[s] under an Order Form."  (MSA § 1, ECF No. 35-4, PageID.339).  "Order Form" was also defined as "the ordering documents, including the EQM Software Subscription Form, for purchases hereunder, including addenda thereto, that are entered into between [NQA] and [Enterprises] from time to time.  Order Forms shall be deemed incorporated herein by reference." (*Id.*).  A single page "EQM Software Subscription Form" was attached at the end of the MSA and executed on the same date as the MSA.  (ECF No. 35-4, PageID.347).  Finally, another page

entitled "Additional Services Provided to NQA by Jadian" provided for a payment of $225 per quarter for IAAR (Independent Association of Accredited Registrars) Database Participation; a payment of $200 per quarter relating to the Source Code Escrow Fees in Purchase Order 1334; a payment of $900 per quarter for nightly backup fees; a payment of $1,950 per quarter for hosting fees, and a payment of $3,000 per quarter for "monthly bulk time."  (ECF No. 35-4, PageID.348). The parties disagree on the level of service to be provided under the MSA. Jadian avers that it only provided "basic support" to NQA, and that NQA did not purchase the optional "upgraded support," which would have required a separate "Order Form."  (MSA § 3.1, ECF No. 35-4, PageID.340).

As already noted, the MSA included express language expressing the parties' intention to define their dealings under the MSA, rather than the ad hoc agreements preceding it.  Specifically, section 13.8 of the MSA provided that

> **13.8 Entire Agreement.**  This Agreement, including all exhibits and addenda hereto and all Order Forms, constitutes the entire agreement between the parties and supersedes all prior and contemporaneous agreements, proposals or representations, written or oral, concerning its subject matter.

(MSA § 13.8, ECF No. 35-4, PageID.346).  In a Declaration, Jerry Norris, the former president of Enterprises, confirms that the MSA was "intended to supersede any and all agreements related to the use of the EQM software . . . .  We made sure language in the MSA superseded draft copies and reversions [sic] of the [Software License Agreement]." (Norris Decl. ¶ 14, ECF No. 108-1, PageID.1511).

NQA also recognizes the importance of the MSA in defining the parties' contractual commercial relationship.  In fact, NQA's motion to strike the jury demand depends on the MSA. Paragraph 12.4 of the MSA includes a waiver provision:

> **12.4 Waiver of Jury Trial.** Each party hereby waives any right to jury trial in connection with any action or litigation in any way arising out of or related to this Agreement.

(MSA ¶ 12.4, ECF No. 35-4, PageID.345).

### 3. Invoices – January 2012 through February 2014

Enterprises sent invoices to NQA for payment towards its services on a quarterly basis. Jadian has submitted the invoices from January 2012 through February 2014 as part of the record. (ECF No. 95-4). This period roughly corresponds to the time when the parties operated under the MSA. The most recent invoice has a coverage period of April 1, 2014 through June 30, 2014 and is stamped "PAID" dated March 20, 2014. (ECF No. 95-4, PageID.1385). The description of services include: EQM Subscription Fees; Bulk Time Fees; Hosting Fees, Database Upload Fees, and Source Code Escrow Fees. (*Id.*).

### 4. Jadian Acquires Enterprises' Assets – May 2014

On May 9, 2014, Jadian acquired Enterprises' assets through an Asset Purchase Agreement.[3] (ECF No. 85-10). Under Article I, Jadian was assigned certain assets of Enterprises' including Enterprises' contracts. (Asset Purchase Agreement Art. I, ECF No. 85-10, PageID.1156). The PSA, MSA, and Escrow Agreement were all specifically listed in the referenced schedule. (Schedule 1.1.6, ECF No. 85-10, PageID.1218). The schedule also mentioned Software License Agreements that Enterprises had with its other customers, but no mention of a SLA was made with respect to NQA. (*Id.*). Enterprises appears to have wound up its business affairs shortly after this agreement was executed.

---

[3] The purchase agreement mentions Epazz, Inc. Plaintiff Jadian is a wholly owned subsidiary of Epazz, Inc. Epazz was originally named as a co-plaintiff but was dropped as a named-plaintiff in the Corrected Complaint, filed on October 23, 2017 (ECF No. 4).

5.    **NQA Experiences Problems with the EQM Software –**
        **May 2014 through June 2014**

The parties agree that NQA was experiencing problems with the EQM software shortly

after (if not before) Jadian took over for Enterprises.  The parties disagree on who was at fault.

One of the specific complaints NQA made to Jadian was that a failure in the software was

causing NQA's own invoices not to be emailed to NQA's clients.  (ECF No. 56-4).  Jadian states

that the invoices were being generated properly and that the system was creating the emails

containing the invoices, but the email addresses were missing from the messages, even though

they were in the database.  According to Guy Metz, a Chief Technology Officer for Enterprises,

delivery of the invoices required third-party software and hardware that was maintained and

controlled by NQA.  (Metz Decl. ¶¶ 8-9, ECF No. 99, PageID.1475).  Mr. Metz stated there was

no easy fix to the problem, and that additional time was needed to develop a software fix.  (*Id.* at

¶ 10).  Rather than work with Jadian, however, Jadian says NQA decided to hire a former

Enterprises employee as a consultant to fix the problem, for which it invoiced Jadian.[4]

NQA alleges it was also experiencing other issues with the software and Jadian's support

services.  For example, Christopher Coomey, a global business systems manager at NQA, stated

in a Declaration that NQA paid Enterprises in full for three projects that neither Enterprises nor

Jadian ever delivered.  (Coomey Decl., ECF No. 84).  These projects included a May 2011 Order

for a "Remote Auditor," a 2013 Order for OASIS Database Management, and a Monthly Auditor

Scorecard project.  (*Id.*).  Furthermore, NQA says it had trouble accessing the EQM software

through the website portal.  NQA points to a May 17, 2014, email from NQA's Auditor Manager,

---

[4] That employee, William Allison, along with another former Enterprises employee, Joseph Nagel,
were originally named co-defendants.  They have since reached an agreement with Jadian and have
been dismissed from this case.  Accordingly, this Opinion and Order focuses on NQA—the only
remaining Defendant.

Peter Theobald, to Jadian.  In the email, Mr. Theobald reported that the "production site" was down, and that a fix was "extremely urgent."  (ECF No. 85-12, PageID.1236). In a follow-up email, Mr. Theobald complained of "APPALLING customer service."  (*Id.* at PageID.1234).  A few days later, Enterprises' President Jerry Norris emailed Jadian's President Shaun Passley to let him know that NQA's account was in "bad shape." (ECF No. 85-13, PageID.1238).

> ### 6. Jadian and NQA Representatives Meet to Discuss the Support Issues – May through August 2014.

NQA and Jadian representatives subsequently met to discuss the transition and NQA's complaints.  On May 19, 2014 Jerry Norris (who stayed on for a time as a consultant for Jadian) met with Peter Theobald and Chris Coomey.  The meeting's minutes reflect that the "bottom line" was that Jadian had "about 10 days to turn this around or [Peter Theobald] is not renewing and is going to bring the support and development in house."  (ECF No. 85-13, PageID.1239).  The minutes contain similar remarks regarding the remote auditor, OASIS, and scorecard projects. (*Id.* at 1240).

The parties reconvened during a May 27, 2014 meeting that, in addition to other representatives, also included NQA's president, Kevin Beard, and Jadian's President Shaun Passley.  (ECF No. 85-8, PageID.1094).  During the meeting Kevin Beard stated it was his intention to renew the "quarterly support contract" that was set to expire at the end of June and it was noted that Epazz (Jadian) would provide NQA with the quarterly invoice at the end of June. (ECF No. 85-8, PageID.1094).  The minutes also reflect that Shaun Passley agreed to provide NQA "with a DVD copy of the [EQM] source code immediately and a fresh copy each time the escrow is updated[.]"  (ECF No. 85-8, PageID.1094-1095).  The parties agreed to continue with a weekly support meeting.  (ECF No. 85-8, PageID.1095).

At the next meeting on June 2, 2014, the parties discussed the three open projects.  The projects were "currently in progress" but it was noted they were "due in April."  (ECF No. 85-8, PageID.1096).  It was also noted that the source code was to be placed with Iron Mountain.  (*Id.*).  The minutes for the next meeting, on June 16, 2014, clarified that Jadian would not be sending any source code directly to NQA, but rather the source code would be uploaded once a quarter to Iron Mountain.  (ECF No. 85-8, PageID.1101).  The parties continued to meet throughout the summer, through at least August 11, 2014, to discuss updates on the software.  (ECF No. 85-8, PageID.1116).

### 7.   Jadian Does Not Pay the Next Invoice and Requests the Source Code – June 2014 through July 2014.

While the weekly meetings over software support were continuing, there were also outside discussions about the parties' continued relationship. Shaun Passley and Keven Beard sent a series of emails to each other on June 23, 2014 about the EQM source code. The two discussed possible modifications to existing agreements, or the creation of new agreements, that would spell out the parties' obligations.  (ECF No. 95-7).  The same day, Jadian's attorney sent Kevin Beard a letter stating that Jadian wanted to reach an agreement on the outstanding issues and continue to do business with NQA.  (ECF No. 95-8).  The subject line of the letter was the "Software Licensing Agreement with Jadian, Inc." but the content focused on an October 23, 2008 agreement, which was the date Purchase Order 1334 was executed.  (ECF No. 95-8, PageID.1401).

Notwithstanding Kevin Beard's earlier indications, NQA did not pay the invoice due at the end of June 2014 for the next quarter.  NQA decided it would not prepay for those services "[d]ue to Jadian's demonstrated inability to provide support and software development[.]"  (ECF No. 83, PageID.907).  So, at the beginning of the new quarter, on July 2, 2014, Martin Dresser, the Chief Contracting Officer for NQA's parent company, sent Shaun Passley a letter stating that it was a

"cure notice" of default under the termination provision of the SLA.  The letter also referenced the PSA.  In the letter, Mr. Dresser wrote that "Jadian's service performance has declined well below acceptable limits over the past four months."  (ECF No. 95-13, PageID.1431; *see also* SLA Rev. A. Ex. C. § VII(c), ECF No. 15, PageID.88).  The letter also requested delivery of the source code that NQA says it was owed under the SLA within ten days.  (ECF No. 95-13, PageID.1432).

After receiving Martin Dresser's cure notice citing the SLA, Shaun Passley wrote to Kevin Beard that the SLA was not in effect, and that it was the MSA, PSA, and Escrow Agreements that were the "current agreements . . . in effect."  (ECF No. 85-19, PageID.1263).  Shaun Passley also responded that NQA was currently using the software without payment, and Jadian needed a payment of $12,000 in EQM subscription fees for NQA to continue to use the software.  (*Id.*). Then, on July 3, 2014, Shaun Passley responded to Martin Dresser that NQA was not entitled to receive the source code, that the SLA was not an active agreement in effect when Jadian acquired Enterprises, and that the MSA was the effective agreement.  (ECF No. 95-10, PageID.1413).  On July 15, 2014, Martin Dresser responded to NQA's counsel, insisting that Jadian was in default. (ECF No. 95-9).

On July 28, 2014, Jadian communicated to NQA that its development team would not work on support issues until NQA's payment was received.  (ECF No. 85-15, PageID.1251).  Jadian said its developer would focus on the Remote Auditor, Oasis, and Auditor Scorecard projects. (*Id.*).

### 8.    Jadian Requests the EQM Source Code from Iron Mountain – August 2014

Sometime in late August or early September 2014, NQA requested that Iron Mountain release the source code under the terms of Exhibit C of the Escrow Agreement.[5]   Christopher

---

[5] A written request, if there is one, does not appear in the record.

Coomey testified that he was the one who sent the request to Iron Mountain.  (Coomey Dep. 21, ECF No. 85-5, PageID.1067).

After receiving Mr. Coomey's request, Iron Mountain sent a letter, dated September 3, 2014, to the depositor of the source code asking whether it opposed the request.  (ECF No. 85-16).  This was consistent with Iron Mountain's obligations under the Escrow Agreement.  But, as is evident from the face of the letter, Iron Mountain sent the letter not to Jadian, but to Kim Griggs at the Enterprises address.  (*Id.*).  NQA was cc'd on the letter, so Jadian asserts that NQA knew that the notice from Iron Mountain had not been sent to Jadian.  (ECF No. 95, PageID.1319).  NQA argues, however, that it was Jadian's responsibility, under Section 12(h) of the Escrow Agreement, to ensure that Iron Mountain had the correct address on file. In any event, when Iron Mountain did not receive a contrary instruction from Jadian, it released the source code to NQA on September 23, 2014.  (ECF No. 85-17).

The release of the source code appears to have been the last substantial event in the record, although NQA says the parties engaged in limited discussions through the end of 2014.  (ECF No. 83, PageID.908).  Jadian asserts that NQA has used and adapted the EQM source code without payment and without authorization in a manner than runs counter to the confidentiality provisions of the MSA.

## PROCEDURAL HISTORY

On October 17, 2017, Jadian brought this suit against NQA.  The Corrected Complaint raises several counts including breach of contract (Counts I and V); misappropriation of trade secrets and attorney's fees (Counts II and III); and tortious interference with business expectancy, conversion, unjust enrichment, specific performance, and declaratory relief (Counts IV, VI-IX).  At the Rule 16 scheduling conference the Court denied a defense motion to dismiss, except that it

dismissed Count IV (tortious interference) for failure to raise a *Twombly* plausible claim.   (ECF No. 31).

Thereafter NQA filed its Answer which also included a Counterclaim.   Count I of the Amended Counterclaim is against Enterprises for breach of the PSA and MSA.   (ECF No. 44, PageID.394).   Count II is against Jadian for Breach of the PSA and MSA.   (*Id.* at PageID.395).   Count III is for Promissory Estoppel against Jadian.   (*Id.*).   Count IV seeks a declaratory judgment that NQA is perpetually licensed to use the EQM software.   (*Id.* at PageID.396).   Finally Count V is brought against Jadian for unjust enrichment.   (*Id.*).   The Court denied a motion to dismiss the counterclaim in a written opinion dated September 5, 2018.   (ECF No. 64).

Shortly after the Court denied Jadian's motion to dismiss NQA's counterclaim, NQA filed the pending motion to strike Jadian's jury demand.   (ECF No. 65).   NQA avers that the MSA's waiver of the right to a jury trial requires that the entirety of this case be tried without a jury.   (ECF No. 66).   Jadian opposes that motion on the basis that only some of its claims are arguably covered by the waiver.   (ECF No. 71).

Finally, on December 17, 2018, NQA filed the pending motion for summary judgment in its favor on all the remaining claims in the Corrected Complaint and in its favor on all the Counterclaims it raised.   (ECF No. 82).   Jadian filed a response in opposition on January 31, 2019.   (ECF No. 95).   NQA's reply was filed on February 22, 2019.   (ECF No. 104).   Jadian filed a surreply on March 1, 2019.   (ECF No. 108).

## LEGAL STANDARDS

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.   FED. R. CIV. P. 56(a).   Material facts are facts which are defined by substantive law and are necessary to apply the law.   *Anderson v.*

14

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.  In deciding a motion for summary judgment, the court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "[I]f the moving party also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Cockrel v. Shelby Cnty. Sch. Dist.,* 270 F.3d 1036, 1056 (6th Cir. 2001) (quoting *Moore's Federal Practice*).

## DISCUSSION

### 1.  NQA's Motion for Summary Judgment on Jadian's Contract Claims (Counts I & V)

Counts I and V of the Corrected Complaint are breach of contract claims.  Jadian specifically argues that NQA breached the MSA both by failing to pay the invoiced fees, and through its use of the EQM software.  NQA seeks to dismiss Jadian's breach of contract claims because (1) it did not breach the MSA; and (2) Jadian breached the MSA first by failing to provide software support.  To establish a claim for breach of contract under Michigan law, a plaintiff must prove the following: "1) the existence of a contract between the parties; 2) the terms of the contract; 3) that defendant breached the contract; 4) that the breach caused the plaintiff injury." *Timmis v. Sulzer Intermedics, Inc.*, 157 F. Supp. 2d 775, 777 (E.D. Mich. 2001) (citing *Webster v. Edward*

*D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999)).[6]  The Court is able to resolve some contract issues as a matter of law:  specifically, a determination of which agreement controls.  But genuine issues of material fact preclude summary judgment on the contract theories.

A.    *The MSA is the Controlling Agreement*

The parties have somewhat different views over what agreements are in effect between the parties, and this explains some of the disputes between the parties on the contract claims.  NQA asserts, for example, that license fees are governed by the SLA Rev. A, and not by the MSA.  In addition, NQA argues that service fees for bulk time, hosting, database and escrow were never effectively incorporated into the MSA at all.  The Court finds as a matter of law that the MSA is the controlling agreement on the contact claims, and that all of the fee schedules claimed by Jadian were incorporated into the MSA.  Whether Jadian earned those fees, or whether NQA has a valid defense for non-payment because of Jadian's initial material breach, are factual issues for trial.

The MSA supersedes the PSA and all other prior agreements between the parties as a matter of law.  More specifically, the PSA and the SLA relate to the same subject matter as the MSA— the services and terms on which Jadian was providing support to NQA regarding the EQM software, and the terms and conditions under which NQA was allowed to use the software at all. For example, the 2008 PSA provides for the "terms and conditions under which [Enterprises was to] provide [NQA] with project services related to [NQA's] use (or planned use) of [Enterprises's] Licensed Software Products," that is, the EQM software.  (PSA Ex. A § I, ECF No. 16, PageID.91). The MSA, similarly, related to "Purchased Services" made through an order form, the latter of which was, again, the EQM software. (MSA § 2, ECF No. 35-4, PageID.340).  And the whole

---

[6] Both side discuss Michigan law in their breach of contract analysis, and Paragraph 12.1 of the MSA provides that the "governing law is Michigan and controlling United States Federal Law." (MSA ¶ 12.1, ECF No. 35-4, PageID.345).  Accordingly, the Court applies Michigan law here.

point of the SLA—even assuming it became effective—was to prescribe the terms of use for EQM software.  Because the MSA covers the same subject previously covered by earlier agreements, the integration clause provided in Section 13.8 of the MSA plainly applies and, accordingly, supersedes the earlier agreements.[7]

NQA's arguments to the contrary are not persuasive.  It is true that Jadian's President wrote in an email that the PSA was an agreement that was "in effect" even after the MSA had been executed.  (ECF No. 85-19, PageID.1263).  But in a subsequent email on the same email chain, Jadian's President clarified that the MSA "is the effective agreement."  (ECF No. 85-19, PageID.1262).  An assertion in a single email, apparently retracted the next day, would fail to override the plain language of the MSA in any event.

NQA's related argument regarding language attached to Purchase Order 1334 also fails to defeat integration.  According to Jadian, the parties agreed that in the event of Enterprises' Default:

> For Work involving software, firmware or database support services, [NQA] shall have the right to "March-in" and assume control of all of [Enterprises'] data bases and applications utilized by [NQA] and supported by [Enterprises] in the event of any such default, including late deliveries.  Such failure of [Enterprises] to perform shall be determined solely by [NQA].  Any such failure shall also constitute conditions sufficient to cause the release from escrow of any source code, applications and their source code and application and source code updates which [Enterprises] has deposited in escrow for the benefit of [NQA].

---

[7] The integration clause does not supersede the Escrow Agreement.  That was a multi-party agreement devoted to maintenance and potential release of EQM source code under prescribed terms.  Once it became effective, the MSA, and not the PSA or SLA, ultimately defined and controlled the contractual rights and obligations of the parties, breach of which by Jadian potentially opened the door of release of the source code.  But the MSA does not control the terms and conditions of the escrow itself.  The parties obviously intended and expected the Escrow Agreement to continue.  They exchanged messages regarding deposit of updated source code after execution of the MSA.  Moreover, the MSA "Additional Services" addendum includes source code escrow fees.

(Attachment 3 to Purchase Order No. 1334, § 14(b), ECF No. 85-9, PageID.1149).  But even assuming that Attachment 3 was incorporated into the Purchase Order, it was superseded by the MSA.  The MSA obviously covered the same subject matter because at least part of Purchase Order 1334 was incorporated into the MSA on the Additional Services Addendum.  Exactly what part of the purchase order and any attachments to it may require additional parsing of the integration clause in the MSA, and possibly even some fact finding.  But the plain language of MSA § 13.8 supersedes all that went before and leaves both parties to the terms of the MSA for defining their contractual rights and responsibilities.

### B.   *A Rational Fact-Finder Could Conclude NQA Breached the MSA*

Material issues of fact preclude any further rulings as a matter of law on Jadian's contract claims.  Whether NQA breached as a matter of fact, and if so, whether the breach was excused by Jadian's earlier breaches, are hotly contested.  There is evidentiary support for each side's theory.  The Court is satisfied as a matter of law that the MSA is the governing contract.  But the other issues need factual resolution.

NQA first argues that Jadian cannot show that NQA breached the MSA by failing to pay for the listed services in the invoices.    A copy of the fees from the most recent invoice for the April 1, 2014 through June 30, 2014 coverage period appears below:

| Description |
| --- |
| EQM Subscription Fees |
| Bulk Time Fees |
| Hosting Fees |
| IAAR Database Upload Fees |
| Source Code Escrow Fees |
| Coverage Period: April 1, 2014 - June 30, 2014 |

(ECF No. 95-4, PageID.1384).  The Court has already ruled as a matter of law that the MSA agreement controls these issues.  The Court is also satisfied that the "Additional Services"

addendum was effectively incorporated into the MSA.  (ECF No. 35-4, PageID.348).  In Michigan, in order for an outside document to be incorporated into a contract, "the parties must manifest clearly an intent" to do so.  *NILAC Intern. Marketing Group v. Ameritech Services, Inc.*, 362 F.3d 354, 358 n.3 (6th Cir. 2004) (citing Michigan law).  "If the contract language is clear and unambiguous, the contract is construed as a matter of law and enforced as written unless contrary to public policy."  *DaimlerChrysler Motors Co., LLC v. Bill Davis Racing, Inc.*, 408 F. Supp. 2d 337, 345 (E.D. Mich. 2005) (citations omitted).  "Contractual language is construed according to its plain and ordinary meaning, and technical or constrained constructions are to be avoided."  *Id.* (quoting *UAW-GM Human Resource Center v. KSL Recreation Corp.*, 228 Mich. App. 486, 491-492, 579 N.W.2d 411 (1998)).  "If the contract language remains unclear or susceptible to more than one meaning, contract interpretation becomes a question of fact that must be decided by the fact-finder upon an examination of the extrinsic evidence."  *Id.*  Section 13.8 of the MSA provides that "This Agreement, including all exhibits and addenda hereto and all Order forms, constitutes the entire agreement between the parties[.]"  (MSA § 13.8, ECF No. 35-4, PageID.346).  This effectively incorporates the terms.

But determining that the MSA controls and that it includes the "Additional Services" schedule does not resolve the entire claim as a matter of law.  A fact finder could reasonably find that NQA's failure to pay Jadian for these services constitutes a breach of the MSA.  By the same token, a reasonable fact finder could conclude that non-payments were justified by Jadian's own failure to perform.  Similarly, a fact-finder could conclude that NQA's use of the EQM source code and software violated the use and confidentiality provisions of the MSA, and so amounted to a breach of the agreement.  Under Section 6.2 of the MSA, NQA agreed, among other things, not to "create derivative works based on the Services" and also not to "permit any third party to access

the Services[.]"  (MSA § 6.2, ECF No. 35-4, PageID.342).   During his deposition, Christopher Coomey testified that beginning in 2015, NQA modified and enhanced the EQM source code.   In reference to another question about the EQM software, Mr. Coomey also testified that NQA was "constantly looking to make changes and updated our software."  (Coomey Dep. 23, ECF No. 95-6, ECF No. 1394).   Christopher Coomey also testified that NQA gave the source code to Cabem Technologies, which Jadian says is a third-party competitor.   (Coomey Dep. 29, ECF No. 95-6, PageID.1395).   NQA asserts that Cabem is simply one of its agents working as its software developer.   (ECF No. 104, PageID.1494).   But again, a fact-finder could reasonably conclude that NQA obtained and used the source code properly in light of Jadian's own failure to perform.   It will be up to the fact-finder to conclude whether the complained of conduct constitutes a breach, and if so whether it was justified by Jadian's own failure to perform.

In conclusion, the Court concludes as a matter of law that the MSA is the controlling agreement on the contract claims.   The MSA includes the "Additional Services" document.   A reasonable fact finder could find for either party on the factual issues of whether NQA breached, and if so, whether the breaches were justified by Jadian's own failure to perform.   Accordingly, NQA's motion for summary judgment on the contract claims is **DENIED**.

### C.    *Misappropriation of Trade Secrets (Counts II and III)*

In Count II, Jadian alleges a claim for actual or threatened misappropriation of trade secrets under the Michigan Uniform Trade Secrets Act "MUTSA," MICH. COMP. LAWS § 445.1901 *et seq.* and Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*[8]  Jadian also seeks attorney's fees under Count III.   In its motion, NQA says that the EQM software source code is not a trade secret because

---

[8] The elements of misappropriation under both acts are substantially similar. *See Radiant Glogal Logistics, Inc. v. Furstenau*, No. 18-cv-12783, at *8 n.2 (E.D. Mich. Feb. 20, 2019) (Borman, J).

Jadian failed to take reasonable measures to protect the source code; Jadian cannot demonstrate

that NQA misappropriated the source code; and the trade secret claims are barred by the statute of

limitations.  The Court agrees with NQA on the misappropriation argument and does not resolve

the other issues.

### 1.   Applicable Law

The first element a plaintiff alleging misappropriation of trade secrets must prove is that

the information at issue actually constitutes a "trade secret."  *Mike's Train House, Inc. v. Lionel,*

*L.L.C.*, 472 F.3d 398, 410 (6th Cir. 2006) (citing *Stromback v. New Line Cinema*, 384 F.3d 283,

302 (6th Cir. 2004); *Rothschild v. Ford Motor Co.*, 2 F. Supp. 2d 941, 950 (E.D. Mich. 1998)).

The MUTSA defines "trade secret" as:

> (d) "Trade secret" means information, including a formula, pattern,
> compilation, program, device, method, technique, or process, that is
> both of the following:
>
> *(i)*    Derives independent economic value, actual or potential,
> from not being generally known to, and not being readily
> ascertainable by proper means by, other persons who can
> obtain economic value from its disclosure or use.
>
> *(ii)*   Is the subject of efforts that are reasonable under the
> circumstances to maintain its secrecy.

MICH. COMP. LAWS § 445.1902.

Accordingly, "[f]or information to constitute a trade secret under Michigan law, the

information must (1) derive economic value from the fact that it is not known to others who could

make use of it, and (2) be the subject of efforts that are reasonable under the circumstances to

maintain its secrecy."  *Mike's Train House, Inc.,* 472 F.3d at 410 (citing MICH. COMP. LAWS

§ 445.1902(d)).  For this reason, information is not a trade secret if its owner does not use

reasonable measures to maintain its secrecy.  Use of non-disclosure agreements, using password

and log-in protections, and limiting access to data constitute reasonable measures to maintain the

secrecy of trade secrets. *Veteran Med. Products, Inc. v. Bionix Development Corp.*, No. 1:05-cv-655, 2008 WL 696546, at *8 (W.D. Mich. Mar 13, 2008) (Brenneman Jr., M.J.) (collecting cases).

Furthermore, in order to be actionable, there must be a "misappropriation" of the trade secret.  The MUTSA defines "misappropriation" as follows:

(b)  "Misappropriation" means either of the following:

(i)   Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

(ii)  Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:

(A)  Used improper means to acquire knowledge of the trade secret.

(B)  At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.

(C)  Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

MICH. COMP. LAWS § 445.1902(b).   Accordingly, acquisition of the EQM source code alone is not sufficient for a MUTSA violation. For liability to attach under the acquisition prong, the MUTSA requires acquisition by "improper means." MICH. COMP. LAWS § 1902(b)(i). "'Improper means' includes theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means." MICH. COMP. LAWS

§ 445.1902(a).  Disclosure or use of a trade secret may also amount to misappropriation under the circumstances defined in Mich. Comp. Laws § 445.1902(b)(ii).

Finally, while Michigan courts follow the American rule regarding attorney fees, the MUTSA provides an exception.  If "willfull and malicious misappropriation exists, the court may award reasonable attorney's fees to the prevailing party."  MICH. COMP. LAWS § 445.1905.

### 2.  *Application*

The Court finds as a matter of law that Jadian cannot establish misappropriation by NQA of the EQM source code, even assuming that NQA could establish that the EQM software amounts to a trade secret.  The most a reasonable fact-finder could conclude is that NQA received the source code from the third-party escrow agent in breach of contractual commitments, not through any improper means defined by statute.  The parties had created a three-party escrow agreement to address exactly what would happen in the event a breakdown in the commercial relationship between software vendor and software customer.  NQA followed the agreed escrow process and obtained the source code.  There is nothing improper about that, even if a reasonable fact-finder ultimately concludes it should not have happened because there was no breach or failure to perform by Jadian.  Holding to the contrary would convert every breach of contract claim into a possible statutory trade secret claim.  That, in the Court's view, would improperly blur the line between contract and tort.

Even Jadian acknowledges it cannot satisfy the "improper means" prong of misappropriation.  After all, it willingly put the source code in escrow as part of its commercial deal with NQA.  But Jadian argues that Section 1902(b)(ii)(B) can still be met because NQA acquired the source code under circumstances giving rise to a duty to maintaining its secrecy or limit its use.  Such circumstances are present here, Jadian says, because the MSA contained strict

23

prohibitions on copying, modifying, or disclosing the EQM software.  The problem for Jadian, however, is that the disclosure or use of the source code must have been unauthorized.  *See Dice Corp. v. Bold Technologies*, 913 F. Supp. 2d 389, 406 (E.D. Mich. 2012) (misappropriation of trade secrets requires the unauthorized use of the trade secret) (citing *Stromback,* 384 F.3d at 302). It is beyond any genuine dispute that the disclosure and use of the EQM software was authorized by the express terms of the Escrow Agreement when Jadian failed to provide contrary instructions to Iron Mountain.  Jadian was then authorized to use the software for the sole purpose of continuing the benefits afforded to [NQA] by the License Agreement."  (Escrow Agreement, Ex. C § 6, ECF No. 17, PageID.131).

Jadian argues, however, that there was no authorization because Jadian knew or should have known that it was only through accident or mistake that Jadian failed to provide those contrary instructions.  MICH. COMP. LAWS § 445.1902(b)(ii)(C).  The Court disagrees.  There is nothing in the record to suggest that NQA knew or should have known that it had acquired the source code through accident or mistake.   True, it was copied on Iron Mountain's letter addressed to Enterprises. And it may have received communications from Jadian's offices in Chicago, rather than Lansing, as Jadian argues.  But this does not show that Jadian knew or should have known that it had closed up shop in Lansing after the acquisition.  To the contrary, Kim Griggs, the addressee on Iron Mountain's notice, continued to be involved well beyond Jadian's acquisition of Enterprises.  Kim Griggs was copied for example, on July 3, 2014, email from Shaun Passley. (ECF No. 85-19, PageID.1262).  And it was ultimately up to Jadian to make sure the escrow agent had current contact information.  Jadian was, after all, continuing to deposit updated source code with Iron Mountain.

On this record, Jadian cannot show that NQA misappropriated the EQM source code.  To be sure, Jadian may argue that NQA has subsequently used the source code in a way that runs counter to the MSA, but that is an argument for breach of contract.  Similarly, Jadian may argue there was never a failure to perform or justifying invocation of the escrow agreement.  But this, too, is a contractual issue, not a  trade secret theory.  What matters here on the trade secret claims is whether the disclosure and use were "misappropriated" within the meaning of the statute.  The Court concludes they were not.

Accordingly, NQA's motion for summary judgment on Counts II and III is **GRANTED**.

### D.       *Conversion and Unjust Enrichment (Counts VI and VII)*

NQA argues that Count VI, for conversion, and Count VII, for unjust enrichment, must be dismissed because they have been displaced by the MUTSA and by an express contract.  The Court agrees.

The MUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." MICH. COMP. LAWS § 445.1908(1).  In determining whether a claim has been displaced by the MUTSA, courts look to see whether the claim is based solely on the misappropriation of a trade secret, or whether the claim may have some other basis.  *See American Furukawa, Inc. v. Hossain*, 103 F. Supp. 3d 864, 869, 884 (E.D. Mich. 2015) ("The critical inquiry for courts in determining whether a claim is displaced by the MUTSA is whether the claim in question is based *solely* on the misappropriation of a trade secret") (emphasis in original) (citations omitted); *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 946 (W.D. Mich. 2003) (Quist, J.)  ("In determining whether a claim is displaced, courts generally examine whether the claim is based solely upon the misappropriation of a trade secret.  If so, the claim must be dismissed.") (collecting cases).

Jadian's conversion claim is based solely on NQA's alleged misappropriation of Jadian's trade secrets.  Jadian's Complaint asserts that NQA has converted its "Source Code and Work Product." (Compl. ¶ 55, ECF No. 4, PageID.17).  And Jadian's response to an interrogatory asking for the conduct that constituted common law conversion merely referenced its answer to what constituted a misappropriation of a trade secret. (Answer to Interrogatory No. 4, ECF No. 56-18, PageID.692-693).  Consequently, Jadian's conversion claim is displaced by the MUTSA.

Jadian does not dispute that claims that relate to the misappropriation of a trade secret are displaced under the MUTSA, but it notes that the parties disagree on whether the source code may rise to the level of a trade secret, and that if the Court were to determine that the claims are displaced, it would be resolving a disputed issue of fact.  The Court is not persuaded.  In *Bliss Clearing Niagara,* a court from this district rejected a similar argument.  It did so because the purpose of the Uniform Trade Secrets Act is "to preserve a single tort cause of action under state law for misappropriation . . . and thus to eliminate other tort causes of action founded on allegations of trade secret misappropriation." *Bliss Clearing Niagara, Inc.*, 270 F. Supp. 2d at 949 (quoting *Leucadia, Inc. v. Applied Extrusion, Techs., Inc.*, 755 F. Supp. 635, 637 (D. Del. 1991)).  Accordingly "allowing otherwise displaced tort claims to proceed on the basis that the information may not rise to the level of a trade secret would defeat the purpose of the UTSA." *Id.*  The Court finds this authority persuasive.  Indeed, to conclude otherwise would render the displacement statute "meaningless, for it would forbid preemption of state law claims until a final determination has been made with respect to whether the confidential information at issue rises to the level of a trade secret." *Id.* (quoting *Thomas & Betts Corp v. Panduit Corp.*, 108 F. Supp. 2d 968, 972-973 (N.D. Ill. 2000)).  Accordingly, the conversion claim will be dismissed because it has been displaced by the MUTSA.

26

Turning to the unjust enrichment claim, The Corrected Complaint asserts that "[b]y improperly using the Confidential Information, Work Product, Source Code, Jadian's Trade Secrets, and other resources to misappropriate Jadian's property and business opportunities for themselves, Defendants have been unjustly enriched."  (Compl. ¶ 60, ECF No. 4, PageID.17). Jadian also asserts that NQA was unjustly enriched by "[u]sing an Enterprise Quality Management software without paying licenses, software development cost and enhancement fees and upgrades." (ECF No. 56-18, PageID.695).  This count is also subject to dismissal.

First, to the extent that Jadian asserts NQA has been unjustly enriched through its misappropriation of Jadian's trade secrets, that claim has been displaced for the same reason that the conversion claim has been displaced.  *See Wysong Corp. v. M.I. Indus.*, 412 F. Supp. 2d 612, 625 (E.D. Mich. 2005) ("[T]he MUTSA displaces the portion of the unjust enrichment . . .  claims that allege enrichment from misappropriation.").

Second, the remainder of the unjust enrichment claim is also subject to dismissal because of the existence of an express contract.  "There is no claim for unjust enrichment when there exists a valid contract covering the same subject matter." *Iverson Industries, Inc. v. Metal Mgmt. Ohio, Inc.,* 525 F. Supp. 2d 911, 922 (E.D.Mich. 2007).  "Whether a specific party has been unjustly enriched is generally a question of fact . . . [h]owever, whether a claim for unjust enrichment can be maintained is a question of law." *Morris Pumps v. Centerline Piping, Inc.,* 273 Mich. App. 187, 193, 729 N.W.2d 898, 903 (2006).  Here there is a contract, the MSA, governing the same subject matter, that is the alleged wrongful use of the EQM software without payment of subscription fees called for under the agreement.

It is true that "alternatively pleading express contract and implied contract claims (whether styled as unjust enrichment or *quantum meruit*) is allowed when, for instance, there is a dispute

between the parties as to whether an express agreement exists." *Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, 32 F. Supp. 3d 824, 833 (E.D. Mich. 2014) (citing *Cascade Elec. Co. v. Rice*, 70 Mich. App. 420, 426-27, 245 N.W.2d 774. 777 (1976)). "A party is not required to elect to proceed under one theory or the other, but could seek recovery on the basis either of an express contract, or an implied contract if the trier of fact found that the express contract did not exist." *Id.* (internal citations, alterations, and quotation marks omitted). For this reason, the Court was satisfied that the alternate theories should both go forward earlier in the case.

However, "[a] plaintiff can only plead breach of contract and implied contract claims in the alternative if there is doubt as to the existence of a contract." *Id.* at 834. "If the parties admit that a contract exists, but dispute its terms or effect, an action will not also lie for quantum meruit or implied contract. In other words, alternative pleading of an implied contract claim is only allowed in a contract setting where a party doubts the existence of a contract." *Id.* (internal quotation omitted). After discovery in this case, there is no doubt about the existence of the MSA, as the Court has held as a matter of law. The contract defines the rights and obligations of each party with respect to the EQM software and related services.

For these reasons, NQA's motion for summary judgment on Counts VI and VII is **GRANTED**.

### E.  *Specific Performance and Declaratory Relief (Counts VIII and IX)*

The remaining claims are for specific performance and declaratory relief. Jadian seeks specific performance of the obligations of NQA under the agreements, including a return of its source code and work product. (Compl. ¶ 66, ECF No. 4, PageID.18). Jadian also seeks a declaratory judgment under 28 U.S.C. § 2201 that NQA is in breach of contract by obtaining and using the source code; that NQA's past and present conduct violates Jadian's ownership of

Confidential Information, Work Product and Source Code; that Jadian possesses valuable Trade Secrets; and that NQA has made and threatened to make actual and inevitable disclosures of its Trade Secrets.  (Compl. ¶ 73, ECF No. 4, PageID.18).

Neither of these claims are substantive legal claims; rather they are types of damages or remedies that a party may obtain if it is successful on certain other causes of action.  *See Berger Enterprises v. Zurich American Insurance Co.*, No. 15-cv-13879, 2016 WL 4011262, at *5 (E.D. Mich. July 27, 2016) (citing *Laker v. Soverinksy*, 27 N.W.2d 600, 601 (Mich. 1947), and noting the defendant's "last count for relief is one for specific performance.  But specific performance is not a cause of action; it is a remedy"); *Lamothe v. Wells Fargo Bank,* No. 15-cv-10701, 2015 WL 4066766, at *4 n.3 (specific performance "is a remedy, not a stand alone cause of action") (citing *Goryoka v. Quicken Loan, Inc.*, 519 F. App'x 926, 929 (6th Cir. 2013)).

Similarly, the declaratory judgment statute merely provides "a means by which rights and obligations may be adjudicated in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy and in cases in which a party who could sue for coercive relief has not yet done so." 10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2751 at 427 (4th ed. 2016). A declaratory judgment is not a claim; it is a remedy.  *Wyly v. CA, Inc.*, No. 05-cv-4430, 2009 WL 3128034, at *15 (E.D.N.Y. Sept. 29, 2009) (collecting cases).   The remaining claim here is for breach of contract, with the remedy potentially including specific performance and a declaratory judgment. The breach of contract claim will go forward to trial, and if Jadian is successful with that claim it may pursue all available remedies, including specific performance and declaratory judgment. Counts VIII and IX will be dismissed, however, since they are not separate causes of action.

## 2. NQA's Counterclaims

NQA raises several tort counterclaims that, after review, the Court believes are likely subject to dismissal as a matter of law.[9] The claims for promissory estoppel and unjust enrichment seem vulnerable to summary judgment for reasons the Court found similar claims brought by Jadian failed. Similar to unjust enrichment, for example, "for the court to apply promissory estoppel under Michigan law, it must find that an implied agreement exists between the parties, in the absence of an express contract." *APJ Assocs., Inc. v. N. Am. Philips Corp.*, 317 F.3d 610, 617 (6th Cir. 2003); *see also Advanced Plastics Corp. v. White Consol. Indus., Inc.,* 828 F. Supp. 484, 491 (E.D. Mich. 1993) (Feikens, J.) ("If the parties admit that a contract exists, but dispute its terms or effect, an action will not also lie for quantum meruit or implied contract. In other words, alternative pleading of an implied contract claim is only allowed in a contract setting where a party doubts the existence of a contract.") (citations omitted). NQA's promissory estoppel claim appears to rest on its assertion that Jadian has failed in its contractual obligation to deliver three projects. Similarly, NQA's unjust enrichment claim depends upon the payments for projects and services that NQA made to Jadian under the MSA. Because an express contract controls the issue, claims for promissory estoppel and implied contract would seem to be subject to dismissal.

Jadian has not moved for Summary Judgment on the Counterclaims. The Court therefore provides notice that it intends to grant summary judgment for a nonmovant, under FED. R. CIV. P. 56(f)(1) with respect to Counts III and V of the Counterlcaim. (ECF No. 44). The Court also provides notice that it intends to dismiss the declaratory judgment count (IV) because it is simply a potential remedy on a contract theory , not a separate cause of action. The Court sets a deadline

---

[9] Count 1 is a breach of contract claim against Enterprises. (ECF No. 44, PageID.394-395). Enterprises has not appeared in this action, however, and it appears it has not even been served as a third-party defendant. It is subject to dismissal under FED. R. CIV. P. 4(m).

for responses below.  The contract counterclaim must proceed to trial for the same reasons the contract claims of Jadian require trial.

### 3.      NQA's Motion to Strike Jury Demand

Finally, NQA moves to strike the jury demand made in Jadian's Corrected Complaint. Under FED R. CIV. P. 39(a)(2).  NQA argues that Jadian voluntarily, knowingly, and intentionally waived its right to a jury trial in the MSA, and requests that the Court set this case for a bench trial.

The Seventh Amendment provides civil litigants with the right to a jury trial, but this right may be waived by contract. U.S. Const. amend VII; *K.M.C. Co. v. Irving Trust Co.,* 757 F.2d 752, 756 (6th Cir.1985).  "It is clear that the parties to a contract may by prior written agreement waive the right to jury trial." *K.M.C. Co.,* 757 F.2d at 755.  For such a waiver to be effective, it must be done knowingly, voluntarily, and intentionally. *Id.*

Jadian concedes the waiver in the MSA was voluntary, knowing, and intentional.  But it argues the waiver covers only some of the claims at issue.  The Court disagrees.  The language of the contract is broad and covers "any right to jury trial in connection with any action or litigation in any way arising out of or related to this Agreement."  MSA ¶ 12.4, ECF No. 35-4, PageID.345. The only claims left for trial are contract claims under the MSA.  These claims plainly fall within the waiver.  The trial will be to the Court, not a jury.

### CONCLUSION

**ACCORDINGLY, IT IS ORDERED:**

1.  Defendant NQA's Motion to Strike Jury Demand (ECF No. 65) is **GRANTED.**

2.  Defendant NQA's Motion for Summary Judgment (ECF No. 82) is **GRANTED** to the extent that Counts II, III, VI, VII, VIII, and IX of the Corrected Complaint are

**DISMISSED.**  Count IV of the Corrected Complaint has been dismissed by earlier Court Order.

3.  **NOTICE** is given that the Court intends to grant summary judgment for a nonmovant, under FED. R. CIV. P. 56(f)(1) with respect to Counts III and V of the Amended Counterclaim in their entirety, and dismiss Count IV as an independent claim.  (ECF No. 44).  NQA may file a supplemental brief due no later than April 19, 2019.  Jadian may file a responsive brief due no later than April 26, 2019.

4.  The contract claims and counterclaims will proceed to bench trial with the MSA as the controlling agreement at issue.   The prevailing party will have the ability to seek all appropriate contractual remedies, including damages, specific performance and declaratory judgment.

Dated:    April 10, 2019             /s/ Robert J. Jonker
                                     ROBERT J. JONKER
                                     CHIEF UNITED STATES DISTRICT JUDGE