UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JADIAN, INC.,

        Plaintiff / Counter-Defendant,

                                  CASE No. 1:17-cv-907

v.

                                    HON. ROBERT J. JONKER

NATIONAL QUALITY ASSURANCE
USA, INC.,

        Defendant / Counter-Claimant.

_____/


## OPINION

      This is a business dispute between Jadian, Inc. ("Jadian") and its former customer National

Quality Assurance USA, Inc. ("NQA") over NQA's use of the Enterprise Quality Manager

("EQM") software.  The software was integral to NQA's business.  It permitted NQA to provide

auditing services and issue certificates to its own customers in various fields, including the

aerospace, automotive, and information security industries.

      NQA first used EQM under a series of agreements and understandings with a company

called Jadian Enterprises ("Enterprises").  Together, NQA and Enterprises developed a strategic

working relationship:  NQA was Enterprises' largest customer and it provided a steady stream of

work and corresponding income to Enterprises.  Enterprises, in turn, provided close support and

software development to NQA for the vital software.  But in May 2014, with nothing by way of a

heads up, NQA learned that Enterprises had sold its assets to Epazz, Inc., and was closing shop.

The asset transfer included a Master Subscription Agreement, which was the most recent

agreement between Enterprises and NQA.  Epazz set up a wholly owned subsidiary—Jadian—to run the EQM side of the business and try to keep NQA as a customer.  The magic of the strategic partnership between NQA and Enterprises, however, could not be maintained.  And only a few months after the transition, the relationship between the parties was effectively over.

The claims and counterclaims left in this case primarily center on who is at fault for the breakup of the relationship.  Jadian's basic position is that it was providing all the support services it had to under the Master Subscription Agreement and that NQA was making excessive demands that had no contractual footing.  It contends NQA committed the first, indeed the only, substantial breach of the Master Subscription Agreement when NQA failed to pay the invoices for the use of the EQM software; obtained the source code to the software; and used the source code to create derivative works without payment and contrary to NQA's ongoing obligations regarding confidentiality.  NQA's basic position is that Jadian committed the first substantial breach of the agreements only days after the transition from Enterprises to Jadian.  It says Jadian failed to provide a fix when the EQM system failed to send approximately 1,000 invoices via email to NQA's clients.  NQA was forced to bring on a former Enterprises' employee in order to make a fix.  This was, NQA says, merely the first in a series of breaches consisting of instances where Jadian was unable to provide fixes to straightforward problems that could have, and should have, been fixed within hours.  Concluding that Jadian was in breach of the Master Subscription Agreement, NQA says it requested and received the source code to the software as was its right under a three-party escrow agreement.  NQA argues it is using the software in a manner permitted by that agreement.

The parties presented evidence and argued the merits of their positions at a bench trial held on September 10, 11, and 12, 2019.  At the close of the bench trial, the Court took the matter under

advisement.  The parties submitted comprehensive post-trial briefing and proposed findings.  This opinion constitutes the Court's findings of fact and conclusions of law under FED. R. CIV. P. 52.

## FACTUAL BACKGROUND

*1.  A Strategic Partnership*

NQA provides quality and environmental management system registration and certification services; process and product compliance services and support; contract audit services for supplier and internal audits; and consulting services.  It accomplishes this by using the EQM software, a product originally developed by Enterprises.  The EQM software enables NQA to perform compliance checks on its customers.  More specifically, it permits NQA to manage compliance electronically, to conduct audits and inspections, fulfill work orders, deliver invoices, monitor licensing, certifications and permits, and to check compliance enforcement.  Information relating to NQA's audits are kept in a database, and auditors access EQM through an internet-based production website.  Customers of NQA can access their audit information though a similar website.

NQA was a customer of Enterprises.  Its relationship with Enterprises went back to a predecessor of Enterprises, Gateway Systems Corporation ("GSC Mobile Solutions"), and the people involved there.  Guy Metz—then an employee of GSC Mobile Solutions—led the technical development of EQM.  The development began in approximately 2002 and was completed in approximately 2005.  During this time, EQM grew to become "mission critical" for NQA.  Yet it required consistent interaction and communication between NQA and Enterprises to make things work.  Jerry Norris, Enterprises President, and Peter Theobold, NQA's customer representative to Enterprises, were engaged in constant communication, often speaking every day.  And the parties

maintained a Google wiki listing the various tasks, work orders, and completion estimates for various requests or issues that NQA was having with the software.

Notably while EQM was valuable to NQA, it was not a stable platform, and the complex system often had components or functions that failed or crashed. It needed persistent maintenance and support, and swift attention when the system did fail. Two of Enterprises' employees, Joseph Nagel and Bill Allison, were primarily responsible for handing the support calls from NQA and providing fixes to the EQM software. Guy Metz also provided some high-level support, however most of the on-the-ground technical support was supplied by Mr. Nagel or Mr. Allison. In all of this, Enterprises and NQA had a steady relationship: NQA was satisfied with the maintenance services it was receiving from Enterprises, and Enterprises received payment for those services— sent via various invoices—from NQA on time.

The magic depended on relationships and earned trust in the day-to-day process of making things work.

### 2. *Escrow Agreement*

Given the "mission critical" nature of the EQM software, NQA wanted to ensure that it would be able to continue operating the EQM software even if Enterprises failed as a business or otherwise stopped supporting the software. To that end, NQA asked Enterprises to enter into an escrow agreement relating to the source code for the EQM software. Access to the source code would allow NQA to maintain the software program and make modifications or changes to that program as needed. Enterprises agreed to NQA's request, and on December 1, 2008, the parties entered into a Three-Party Escrow Service Agreement with Iron Mountain Intellectual Property Management ("Iron Mountain"). Under that Agreement, Enterprises deposited source code with

Iron Mountain.  NQA could request that Iron Mountain release the EQM source code if Enterprises failed to perform in certain specified ways.

Exhibit C of the Escrow Agreement set out the procedures Iron Mountain would follow if NQA asked for the release of the source code.  Iron Mountain would, first, send a written notice to Enterprises within five business days of the receipt of NQA's request.  The Agreement specified the notice would be sent to the last known address of Enterprises' Authorized Person.[1]  Thereafter, Enterprises had no more than ten business days to deliver contrary instructions to Iron Mountain.  If no contrary instructions were received, the Agreement provided that Iron Mountain would be authorized to release the EQM source code to NQA.  NQA would then have "the right under this Agreement to use the [source code] for the sole purpose of continuing the benefits afforded" to NQA under their license agreement.

As called for under the Escrow Agreement, Enterprises deposited updated source code to Iron Mountain on each subsequent quarter through April 28, 2014.  NQA also paid the $200 source code escrow fee on the invoices through June 30, 2014.

### 3. The Master Subscription Agreement

On January 26, 2012, a little over three years after signing the Escrow Agreement, Enterprises and NQA entered into a Master Subscription Agreement ("MSA").   Before that, the

---

[1] The Escrow Agreement made clear that it was incumbent on Enterprises to keep Iron Mountain apprised of the correct address to send communications to.  Section 12(h) of the agreement provided that all parties had the "right to rely on the last known address of the Parties" and that "[a]ny correctly addressed notice to last known address of the other Parties that is relied on herein and that is refused, unclaimed, or undeliverable because of an act or omission of the Party to be notified as provided herein shall be deemed effective as of the first date that said notice was refused, unclaimed, or deemed undeliverable by electronic mail, the postal authorities by mail, through messenger or commercial express delivery services."  Enterprises' authorized person listed in the Escrow Agreement was Kim Griggs, an Enterprises Vice President, with a listed address at Enterprises' place of business in Lansing, Michigan.

parties had been operating under a series of license agreements and understandings going back to NQA's relationship with GSC Mobile Solutions. The MSA superseded those earlier arrangements. More specifically, section 13.8 of the MSA contained an integration clause and the MSA plainly covered the same subject matter previously covered by the earlier agreements, namely, the services and terms on which Enterprises was providing support to NQA regarding the EQM software, and the terms and conditions under which NQA was allowed to use the software. In its earlier summary judgment decision, this Court concluded the MSA superseded all other license agreements between the parties as a matter of law.[2]

Section 5.1 of the MSA provided for one-year subscription terms. The fees for these terms were based on an estimated number of annual audit days, and an EQM Software Subscription Form provided an estimate of 9,000 audit days a year for the initial term. Audit days related to the number of days an audit team had to be onsite to conduct auditing work for a customer. A complicated manufacturing company might require twenty audit days, while a smaller operation might require only one or two, depending on the type of audits. Basing fees on audit days was part of an intended shift between the parties in the MSA to a more transactional approach. But in practice the parties always agreed at the beginning of each year what the annual subscription fee would be, and at the end of each year Enterprises did not charge or credit NQA any amount based on the actual number of audit days that took place. That is, Enterprises did not charge NQA an additional amount if the audit days went over the estimate, or credit NQA if the actual audit days

---

[2] It did not, however, supersede the Escrow Agreement. The integration clause of the MSA meant that the MSA, as opposed to the earlier agreements, defined and controlled the rights and obligations of the parties, breach of which by Jadian would potentially open the door to release of the source code. The MSA did not control the terms and conditions of the Escrow Agreement, and the parties obviously intended to continue with the Agreement. Enterprises continued to deposit updated EQM source code with Iron Mountain through April 2014, and the $200 payment was included on the quarterly invoices.

6

were under the estimate.  So, for the term beginning on February 2, 2012, Enterprises and NQA agreed that NQA would pay Enterprises a subscription fee of $45,000 in four quarterly payments of $11,250 each.  These amounts were billed to NQA, and NQA paid them, without any end of the year accounting between estimated and actual audit days.  This practice continued for the 2013 term.  As with the year before, Enterprises billed NQA for the subscription fees, and NQA paid the invoices.  For the term beginning in 2014, the parties agreed that NQA would pay a subscription fee of $50,000. NQA paid the invoices for subscription fees for the period through June 30, 2014.

In return for the subscription fees NQA paid under the MSA, Enterprises agreed to provide, among other things, "basic support" for purchased services, that is, the EQM software.  Both Jerry Norris, for Jadian, and Peter Theobald, NQA, testified that "basic support" was assistance that Enterprises would provide whenever bugs or other issues prevented a user from using the software. As Peter Theobald put it, basic support was there to fix problems that would crash the system and bring the software back up to "baseline" so that NQA could use the software for its intended use.

The MSA also referenced and incorporated the parties' earlier agreement with respect to "bulk time."  This was time for the work that Enterprises would do to provide software enhancements to EQM that were requested by NQA, and was separate from the fixes that Enterprises would make under basic support.  These enhancements would typically require at least two or three hours of work.  In 2012 and 2013, NQA paid Enterprises $3,000 a quarter for nine bulk time hours each month.  The amount increased to $3,200 for 2014, and NQA paid the bulk time invoices for the period through June 30, 2014.

The MSA also provided for "purchased services," which were for special development projects over and above basic support and bulk time work.  The development projects were to be handled under the MSA with separate purchase orders.  There were three pre-paid and open

7

purchase orders that originated with Enterprises and carried over to Jadian.  Neither Enterprises nor Jadian ever delivered on the projects.  The projects are described in the following section.

    *4.   Software Development Projects*

    In addition to basic support and bulk time work, NQA paid Enterprises in advance for three software development projects. The first project was requested in 2011.  This was for a "remote auditor" development that updated and automated EQM's report creation, dispatch and tracking. NQA requested the development so that its auditors could use a laptop or mobile device to record data during the auditing activity off site, and then upload the data to EQM.  Bill Allison at Enterprises worked on the development of the project.   There was disagreement at trial on whether this project was completed by Jadian.  The Court credits the testimony at trial that established this project was not completed and delivered to NQA either by Enterprises or by Jadian.

    The second project was a 2013 request by NQA for Enterprises to create a "monthly auditor scorecard," a project to improve auditor performance and evaluation of the feedback functionality of the EQM software.  Like the other projects, NQA paid in advance for the completion of this project.  Bill Allison also worked on developing this project.  The auditor scorecard project also was not delivered to NQA, either by Enterprises or by Jadian.  The testimony to the contrary from Jadian's representative, Shaun Passley, was not credible.  It was based only on his own assurances, and unsupported by the record.  Indeed, the record reflects the project ultimately came to a standstill without resolution.  Minutes from a December 8, 2014 meeting reflect that the parties to the meeting had reached an impasse and recognized that upper management would need to be involved.  Minute notes from the subsequent meeting demonstrate that there was no assurance that the scorecard project was "ready to go."  In any event, it was never delivered to or implemented by NQA.

The third project that NQA requested from Enterprises, and paid in full for, was to add a function to the EQM software to facilitate the transfer of NQA's database relating to audits of its aerospace customers to the Online Aerospace Supplier Information System ("OASIS") database, an outside database containing supplier and audit assessment data for those companies holding accredited certifications in aerospace standards. Like the other projects, Bill Allison worked on the development of this function for EQM. And like the other projects, neither Enterprises nor Jadian ever delivered on the project.

5. *A Fumbled Handoff*

Eventually Enterprises decided to fold and sell its assets to Jadian, a wholly owned subsidiary of Epazz, Inc. At this time Enterprises was made up of six individuals, its CEO Jerry Norris, two business managers Kim and Karen Griggs, Guy Metz, Bill Allison, and Joseph Nagel. Epazz, through its President Shaun Passley, and Enterprises, through a broker, had been in negotiations for a number of months. Shaun Passley was interested in acquiring Enterprises, and specially the EQM software, because he believed the software's workflow on compliance issue could be applied across a number of industries.

The transfer of assets took place through an Asset Purchase Agreement between Enterprises and Jadian on May 9, 2014. As part of the deal, Jadian paid Enterprises $215,000 and delivered a promissory note for $210,000 requiring Jadian to make monthly payments to Enterprises. Epazz guaranteed Jadian's obligations under the note.

While Epazz was interested in applying the EQM software across a number of industries, it did not have a solid plan for transitioning the services Enterprises provided to NQA from Enterprises to Jadian. There was an ostensible plan on paper, but it was not adequate to the task and reflected a fundamental misunderstanding by Epazz as to what made the relationship between

9

Enterprises and NQA work.  In particular, Jadian did not hire either Bill Allison or Joseph Nagel even though they were critical to the day-to-day operation of the software and management of the relationship.  Instead, Epazz hired Guy Metz for a six-month stint, and paid Jerry Norris as a contractor for a short period.  Neither were able to do the work of Allison or Nagel, but they were supposed to train Jadian's own developers, located overseas, on managing and developing the EQM software.  Epazz also hired Enterprises' Kim and Karen Griggs as consultants.

Without either Bill Allison or Joseph Nagel onboard, Epazz had no workable transition plan to shift support operations from Enterprises to Jadian.  Neither Jerry Norris nor Guy Metz had experience in providing basic support to NQA on the EQM software.  Before the handoff, Enterprises also provided no training to the overseas software developers of Epazz / Jadian.  This meant those developers were not up to the task of developing and maintaining the EQM software.  As Jerry Norris put it during his testimony, Jadian's plan was not solid, and it could not replicate the magic that Enterprises had developed.   Shaun Passley also tacitly admitted during his trial testimony that his developers were not up to the task at the time of the transition, and that it would take some additional time following the transition for them to be brought up to speed.

In addition to the lack of a workable transition between Enterprises and Jadian, Epazz also failed to keep NQA in the loop.  In fact, there were no communications between Epazz / Jadian and NQA prior to the sale.  Considering that NQA was by far the largest customer of Enterprises, this was an inexcusable omission of the part of Epazz / Jadian.  At bottom, there was no workable plan in place to transition EQM support from Enterprises to Jadian, this despite the fact that NQA was the single most important customer for Enterprises.

6. *Jadian Fails to Replicate the "Magic" of the Previous Strategic Partnership*

The weekend following the acquisition, Jerry Norris called Peter Theobald at NQA to tell him about the transfer from Enterprises to Jadian. There was no communication at all before the acquisition. The following Monday, May 12, 2014, Peter Theobald sent an email to Karen Griggs asking for information on the transition process as well as assurances for ongoing support for the EQM software. He also asked for an update and a "go forward" plan on the projects that NQA had paid for in advance, including the OASIS project, remote auditor, the auditor scorecard, and bulk time. When he did not receive a response, Mr. Theobald forwarded the email to Jerry Norris, Kim Griggs, and Guy Metz asking for a response. Karen Griggs then responded later that evening. Rather than present any transition plan, Ms. Griggs stated that they were looking into the issues that Mr. Theobald had raised.

The inadequacy of Jadian's transition plan was made clear two days later, on May 14, 2014. On that date, NQA discovered that approximately 1,000 of its invoices were not emailed to NQA's customers. These emails were supposed to be generated and sent through the EQM software. It was important for NQA to generate those invoices in a timely manner, since it affected the company's cash flow. Coleen Abby, an NQA Account Manager, reported the issue to Jadian by sending an email to Karen Griggs. She asked for an immediate fix, no later than the following morning.

Ms. Griggs responded to Ms. Abby the same day stating that the support team was working on the issue with the goal of providing a fix by the end of the day. Separately, Ms. Griggs emailed Guy Metz, the Jadian support team, Shaun Passley, Jerry Norris, and Donna Kelly (a Jadian project manager). Ms. Griggs stated that the invoice issue was an "emergency situation" and that it was a "VERY high priority" for NQA. She asked that either she or Jerry Norris be cc'd on any

communication with NQA since they were still considered NQA's contacts "until the new Jadian Inc. team has contacted NQA."   Jadian subsequently assigned Guy Metz to work on the issue. But, as noted above, Guy Metz had no experience working on basic support to NQA.   And ultimately, Guy Metz was unable to provide a fix by the end of the day, or indeed the next day.

Two days after NQA made its initial report to Jadian about the invoicing issue, and with no fix in place, Peter Theobald wrote to Guy Metz about the missing invoices.   He remarked that "I am under an incredible amount of pressure to get these out, many are approaching certificate suspension for failure to pay an invoice that they haven't received, this is seriously impacting our cash flow, I need these out today.   If these can't b [sic] done, please let me know so I can make alternative arrangements."

The parties engaged in further communication, which included bringing Joseph Nagel (who was not retained by Jadian) into the conversation.   Peter Theobald then spoke to Guy Metz and asked him to bring on Bill Allison to fix the problem.   Metz did not do so.   Ultimately it was NQA—three days after it made its first report to Jadian—that brought on Bill Allison at its own expense to look at the invoicing issue.   Bill Allison fixed the problem.   This much was acknowledged by Guy Metz in an email to Peter Theobald on May 21, 2014.   In the email, Guy Metz reported that Bill Allison had completed the final fix to the invoicing problem.   NQA paid Bill Allison $1,800 for his work, and on May 21, 2014 NQA emailed an invoice to Epazz seeking reimbursement for the amount it paid to Bill Allison.   The Jadian Support account acknowledged receipt of the invoice.   However, several days later Shaun Passley told Peter Theobald that it would not accept any invoices from NQA for contracting Bill Allison.

For NQA, the invoicing issue posed an urgent business problem.   The invoices at issue represented over a million dollars' worth of revenue.   But Jadian, and specifically, Shaun Passley,

failed to see the importance.  At trial, Mr. Passley testified that NQA could have brought on a few interns to manually send the emails if it wanted to, thus underscoring that he still does not understand what servicing his most important customer means.  This astonishing testimony, standing alone, demonstrates for this Court why the Jadian-NQA relationship was doomed to fail and why Jadian was responsible for the failure.  Ultimately, Jadian forced NQA to solve a critical business problem on its own by hiring a person Jadian refused to hire, and then refused to reimburse NQA the $1,800 it cost to fix the issue.

   *7.  Jadian and NQA Meet*

   Meanwhile, NQA was dealing with other issues relating to the EQM software.  On May 17, 2014, Peter Theobald emailed the Jadian support team to let them know the production site—a page used by NQA's auditors and employees—was down.  He stated this was an extremely urgent issue and asked for a fix within the hour.  But it was Chris Coomey—an NQA employee—and not the Jadian support team, that provided the fix.  And in providing this fix, Chris Coomey discovered that the NQA EQM domain was no longer being serviced.  This meant that NQA's EQM users were unable to access the EQM site.  Peter Theobald wrote to the Jadian support team on May 17, 2014, asking about the issue that Mr. Coomey identified.  He also noted his dissatisfaction with the Jadian support team.  Mr. Theobald complained of the team's lack of communication and "appalling" customer service.

   Jerry Norris tried to smooth things over.  He sent a message to Shaun Passley on May 19, 2014, attaching minutes of a meeting between himself, Peter Theobald, and Chris Coomey.  The minutes reported that Peter Theobald felt that Jadian faced an "uphill battle" to turn things around, but NQA was willing to give Jadian until the end of May to demonstrate it could provide the service that NQA expected.  Mr. Theobald wanted a plan for support, and a recognition on Jadian's

part of the seriousness of the issues.  Mr. Norris summarized the meeting by telling Shaun Passley

that the account was in "bad shape" and that Mr. Passley needed to speak with Peter Theobald.

That meeting between NQA representatives and Shaun Passley, however, did not take

place until May 27, 2014, eighteen days after Epazz / Jadian acquired Enterprises.  Notes from the

meeting, however, reflect that Jadian still was not ready to provide basic EQM software support.

In fact Shaun Passley reported that Jadian had hired additional developers and they would be able

to provide "development resource in the next few weeks."  This was cold comfort for NQA with

immediate business issues.  Jadian designated Donna Kelly[3] as NQA's account manager, and the

parties agreed to have weekly meetings to continue discussions about Jadian's support of NQA's

EQM requests and projects.

### 8.  *Following the Fumbled Transfer, Jadian Fails to Recover*

Meeting notes from the weekly meetings make clear that Jadian's faulty transition plan

meant that there was no real prospect Jadian would ever be able to provide the support that NQA

needed for EQM.  Indeed, the notes reflect that NQA grew increasingly frustrated with Jadian's

inability to provide the basic support it had contracted for, and its failure to move the ball forward

on NQA's project requests.

On May 27, 2014, the same day of the first meeting between NQA and Shaun Passley,

Peter Theobald asked Jadian for a "view," or an information summary, about NQA's auditors for

approximately the last two years.  Mr. Theobald stated his request was "urgent"; he needed the

information to prepare for a board of directors meeting.  The unrefuted trial testimony was that

this was not a complicated request, and one which was covered by Jadian's obligations to provide

---

[3] Donna Kelly died in October 2016, before this suit was filed and only a few of her records and
emails appeared in the summary judgment and trial record.

basic support.  Joseph Nagel testified that this request was something that should have taken one to two hours to accomplish, and Peter Theobald testified that Mr. Nagel had fulfilled similar requests while they were speaking on the phone.  Yet Jadian did not respond to Mr. Theobald's request on May 27, and the next day Peter Theobald emailed Donna Kelly asking for an update. He stressed the time sensitive nature of the request.  Jadian then responded with a report, but it was missing several data points that NQA had requested and contained missing, or inaccurate, information.

During the weekly meetings, Jadian reported slow progress on the request.  Because they were not familiar with the databases, Jadian's developers did not know how to find the procedures and functions necessary to create the requested view.  And in the end Jadian was not able to provide the report to NQA's satisfaction.  On June 5, 2014, Peter Theobald wrote to Donna Kelly:

> [It] has now been 9 days since I requested [the view], it is incredibly urgent, I have in excess of 30 emails, countless reassurances concerning this issue but no results, for what was a relatively straight forward request.  I understand the transition is difficult and a steep learning curve for everyone, but that's why we have transition planning to ensure continuity of support and to ensure Epazz can meet it's [sic] contractual obligations with regards to the provision of support.  I think its [sic] safe to say that you are currently failing to fulfill your obligations.  At this point I am at my wits end I have no faith that your organization has anywhere near the resources to support us, nor are you prepared to go outside to find them to meet your customers [sic] needs.

Jadian was not able to fulfill the request by the board of directors meeting, and Peter Theobald went to the meeting without the information he had requested from Jadian.  Jadian eventually was able to complete the request more than three weeks after NQA had asked for it, but it took Joseph Nagel—whom NQA brought on as an employee at the beginning of June—to help Jadian's developer provide the requested view.

There were other issues too.  On May 29, 2014, NQA reported that EQM was not uploading certificate information from the NQA database to the Independent Association of Accredited Registers (IAAR) website.   NQA had been paying $225 a quarter as an upload fee of its information to the IAAR website.  The website compiled certificates from various sources into a single database.  The upload issue was a problem for NQA because it meant the publicly accessible website had inaccurate or missing data.  More specifically, the website would display certificates that NQA had withdrawn as apparently valid, or would fail to display valid certificates that NQA had issued.  NQA reported the issue at the June 2, 2014 meeting between NQA and Jadian Representatives.  At the next meeting, on June 9, 2014, it was still not resolved.  And meeting notes from June 16, 2014, described that Guy Metz had looked into the IAAR issue, but that he still needed more information.  So NQA again assigned one of its own employees to help Jadian do its work.  Joseph Nagel was asked to provide some examples so that Mr. Metz could trace the issue.  Even that, however, did not work.  The issue was still not fixed by the June 23, 2014, meeting and Peter Theobald forwarded the original email sent to the Jadian support team to Guy Metz.  At the July 7, 2014, meeting, the last meeting where the notes described the IAAR issue in any detail, there was "[n]o additional information available" on the IAAR website, and an update was requested from the Jadian support team.

During trial, Peter Theobald testified that Jadian never provided a fix.  The Court credits this testimony over Jadian's position that a fix was made.  Jadian's position is based on inferences from the fact that the July 7 notes indicate that "NQA had not verified whether or not this [that is, the failure of the IAAR website to update] is still happening," that subsequent meeting notes fail to discuss the website in any meaningful detail, and that NQA subsequently provided a check to pay for the IAAR update fee, noting it was paying for those aspects that NQA believed Jadian had

shown adequate performance.  But the July 7th notes indicate that "we are assuming that it is still broken," and an update was requested from Guy Metz.  And the fact that NQA may have paid for the IAAR upload fees does not demonstrate that the IAAR upload issue had been fixed.

### 9.  *Jadian Fails to Deliver Agreed to Projects*

Before Jadian acquired Enterprises, NQA and Enterprises agreed to three software support and development projects.  In 2011, Enterprises agreed to develop a "remote auditor" format for EQM.  The project would update and automate report creation, dispatch and tracking.  The new format would permit NQA auditors to use a mobile device to record auditing data as the auditor performs his or her work.  When the data had been inputted, the auditor could then upload the data into EQM.   In 2013, NQA asked Enterprises to create the second project: a "monthly auditor scorecard" to improve auditor performance and evaluation.  The report would give each auditor a summary of their performance for the month.  The third project was also requested by NQA in 2013.  The project was for a new EQM function for NQA's aerospace customers.  The new EQM project would facilitate data transfer between NQA's database and the Online Aerospace Supplier Information System ("OASIS") database. The project would reduce errors from manual entry of the data.

NQA paid Enterprises in full for all three projects; none of them were completed by Enterprises before the asset transfer.  Once Jadian entered the picture, all sides understood that Jadian—for good or ill—undertook the obligation to deliver the projects and knew that the projects were due under accepted and prepaid purchase orders.  Yet Jadian made little progress on these projects.  For example, a status update on the projects was requested at the June 2, 2014 meeting, and that update was not provided at the following meeting on June 9th.  A formal status report was still not ready on June 16th, though it was noted that Guy Metz would be working on the OASIS

project; that Jerry Norris would speak with Peter Theobald about the Remote Auditor Project; and that a report on the auditor scorecard project would be ready that week.  The June 23rd meeting reflects that NQA was experiencing an error message with the OASIS project, and did not want to receive anything on the project without further testing by Jadian.  Meeting notes from July 7th document that Jadian would get status updates on the projects from their developer.  At the next meeting on July 14th—approximately two months after the acquisition—Jadian was not able to provide a delivery date for any of the projects.  Jadian never delivered them.

### 10. The End of the Relationship

Indeed, what the meeting notes make crystal clear is that Jadian never had a workable plan to provide any meaningful support to NQA.  The onus was always on NQA to provide the upkeep that, under the MSA, Jadian was obligated to provide.  Whether it was Bill Allison with the invoicing issue, or Joe Nagel on the view request or IAAR website, Jadian depended on NQA to provide the knowhow and information on how to use a system it had little familiarity with.

Meanwhile, Kevin Beard, the President of NQA and Shaun Passley engaged in emails and telephone calls regarding the support and projects issues that were documented in the meeting notes.  These discussions, and the various proposals, did not prove to be productive and Mr. Beard and Mr. Passley ceased communications.  NQA also did not pay the subscription fee for the quarter beginning on July 1, 2014, though it made a $1,025 payment for the quarter to cover other things, including hosting fees, IAAR database upload, and source code deposit fees.  On July 2, 2014, Martin Dresser, the Chief Contracting Officer for NQA's parent company, sent the first of two letters complaining that "Jadian's service performance has declined well below acceptable limits over the past four months."

18

On July 28, 2014, Donna Kelly emailed Peter Theobald to tell him Shaun Passley directed that the Jadian "development team will not be working on support issues until payment [for the July 1st invoice of subscription fees] is received.  The developer will be focusing on the three projects that need to be completed."  Jadian continued to send invoices to NQA for things like subscription fees and bulk time through December 2017, but they were strictly pro forma.  Jadian provided no software support, and NQA did not pay the subscription fees, though it made payments to cover hosting, IAAR database uploads, and source code deposit fees through December 2014.

*11. NQA Requests the EQM Source Code from Iron Mountain*

Though the parties engaged in several more meetings about the projects and other development requests, by the end of July 2014, the parties' business relationship was effectively ended.  On September 1, 2014, NQA submitted a request to Iron Mountain to release the source code of the EQM software under the terms of the Escrow Agreement.  Under the terms of the agreement, Iron Mountain provided notice to the last known address on file—Kim Griggs at Enterprises.  This written notice was sent on September 3, 2014.  No one for either Enterprises or Jadian ever responded to Iron Mountain.  On September 23, 2014, Iron Mountain released the source code to NQA, and sent written notice to Kim Griggs at the Enterprises' address it had on file.  Ms. Griggs was one of the people Epazz / Jadian had hired as a consultant immediately after the acquisition.

A few months later, in February 2015, NQA contracted with CABEM Technologies, Inc., to provide EQM software development and support similar to the basic support that Jadian was supposed to provide under the MSA.  NQA and CABEM executed a written Software Development and Support Services agreement for this work.  One of the provisions of the agreement prohibited CABEM from disclosing details and information about the EQM software.

NQA had no further reason to communicate with Jadian, and the record shows that there were no meaningful communications between Jadian and NQA until this litigation began years later.

## PROCEDURAL HISTORY

Jadian brought this action on October 17, 2017.  The Corrected Complaint (ECF No. 4), brought claims against NQA, Bill Allison, and Joseph Nagel based on breach of contract, quasi-contract and tort theories.  It sought, among other things, specific performance, money damages, and declaratory relief.  Following a Rule 16 scheduling conference, the Court dismissed one of the tort claims—Tortious Interference with Business Expectancy (Count IV)—for failure to state a *Twombly* plausible claim.  (ECF No. 31).  Jadian and Defendants Allison and Nagel subsequently accepted the case evaluation and, in an Order dated February 15, 2019, Defendants Allison and Nagel were dismissed from the case, leaving NQA as the sole defendant.  (ECF No. 103).  On April 20, 2018, NQA filed an Amended Answer and Counterclaim.  (ECF No. 44).  The Counterclaims asserted breach of contract against Jadian and Enterprises (the latter as a third-party defendant) for breach of contract.  NQA also brought quasi-contract claims of promissory estoppel, unjust enrichment, and for declaratory judgment.

At the close of discovery, NQA filed a motion for summary judgment in its favor on all the remaining claims and counterclaims. (ECF No. 82).  On April 10, 2019, the Court granted NQA's motion in part and dismissed Counts II, III, VI, VII, VIII, and IX of Jadian's Corrected Complaint. (ECF No. 110).  With respect to the breach of contract claims in Counts I and V of the Corrected Complaint and the contract claims in NQA's Amended Counterclaim, the parties disagreed whether the MSA or earlier agreements and understandings controlled the parties' relationship. The Court resolved that aspect of the claims and counterclaims too, and held that the MSA was the controlling agreement.  But genuine issues of material fact precluded summary judgment on

the contract theories.  At that stage of the case, the Court concluded a reasonable fact-finder could determine that NQA's failure to pay subscription and other fees after June 30, 2014 constituted a breach of the MSA, and that the acquisition and subsequent use of the EQM source code violated the use and confidentiality provisions of the MSA.   But the Court further observed a reasonable fact finder could conclude that NQA's non-payments and use of the EQM source code were justified by Jadian's failure to perform its own contractual obligations.

With respect to NQA's Amended Counterclaim, after providing notice under Rule 56(f), the Court granted summary judgment for Jadian with respect to Counts III and V of the Amended Counterclaim.  The Court also dismissed Count IV as an independent claim, and dismissed Counter-Defendant Enterprises under Rule 4(m), thereby resolving Count I of the Amended Counterclaim as well.

The remaining contract claims proceeded to a bench trial.[4]  In advance of the trial NQA filed a motion in limine (ECF No. 124) seeking to preclude Jadian from eliciting testimony or offering evidence regarding its alleged damages other than damages it allegedly incurred through NQAs failure to pay certain invoices.  The Court considered the motion in the context of the parties' overall presentation and argument during the three-day bench trial held on September 10, 11, and 12, 2019.   (ECF No. 140, 141, 142).  Thereafter the parties submitted post trial briefs, proposed findings of fact and conclusions of law, and responsive briefs.

## REOPENING THE TRIAL RECORD

NQA has also objected to, and moved to strike, certain arguments, contentions, and evidence submitted in Jadian's post-trial briefing that, it says, are improperly raised for the first

---

[4] The Court's summary judgment decision also granted NQA's motion to strike Jadian's jury demand, based on the waiver language in the MSA.

time post-trial.  (ECF Nos. 147, 154, 158).  NQA objects in the main to Jadian's argument in its

post-trial brief that the Uniform Commercial Code governs the MSA.  It also objects to additional

post-trial submissions containing deposition testimony that was not made as part of the trial record,

citations to various treatises that were not read into the record at trial, and affidavits relating to the

authenticity of a screenshot of a website relating to Jadian's damages theory.

NQA's arguments are well taken.  The Court sustains the objections (ECF No. 148 and

154) and grants the motion to strike. (ECF No. 158).  It is axiomatic that post-trial submissions are

not the time to craft entirely new arguments or theories that were not presented at trial and are

based on documents and other evidence that was not a part of the final pretrial order or presented

at trial.  *See Gregory v. Shelby Cty., Tenn*, 220 F.3d 433, 442 (6th Cir. 2000) ("This circuit has

held that a party's failure to advance a theory of recovery in a pretrial statement constitutes a

waiver of that theory."); *see also Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 (2007)

("Claims, issues, defenses, or theories of damages not included in the pretrial order are waived[.]")

(internal citation and quotation marks omitted).

Jadian's arguments seeking to bring this evidence and argument into the case post-trial is

not persuasive.  With respect to the U.C.C., Jadian says it did raise the issue prior to the bench

trial.  It points both to its summary judgment (ECF No. 95) and trial briefs (ECF No. 137).  It is

true that in its summary judgment brief, Jadian cited to Michigan's U.C.C. in a footnote for the

proposition that exclusive-remedy provisions are generally enforceable.  (ECF No. 95,

PageID.1330).  But this is a far cry for asserting that the Uniform Commercial Code covered the

MSA.  Similarly, in a footnote in its pre-trial brief, Jadian contends that the three development

projects (the OASIS database, remote auditor, and auditor scorecard) are governed by the U.C.C.

(ECF No. 137, PageID.1780).  Yet Jadian contends post-trial that the three projects are not a part

of the MSA.  (ECF No. 153, PageID.2532-2533).  By arguing now that the MSA is governed by the U.C.C, Jadian is advancing a fundamentally new theory of the case that it never developed pre-trial.[5]

With respect to the treatises, the parties disagree over how Jadian seeks to use them.  NQA avers Jadian is seeking an end run around the final pretrial order to reopen proofs with substantive evidence.  Jadian disagrees, and avers that it is not suggesting that they be taken as evidence, rather that they be used as persuasive legal authority.  NQA has the better argument.  Jadian did not offer expert testimony at trial.  Its post-trial brief, however, extensively cites to treatises describing, among other things, the typical levels of errors in software maintenance agreements, the recommended response time for fixing each level, and the distinction between certain types of code.  The Court agrees with NQA that these are out of court statements being offered for the truth of the matter asserted.  As such, they are subject to the hearsay rule.  Rule 803(18), furthermore, does not apply to exempt them from the hearsay rule, because the treatises were not called to the attention of an expert.  Parties may not use treatises as a substitute for expert testimony.  As that is what Jadian is seeking to do here, the Court agrees with NQA that they should not be considered.

---

[5] Whether wrapped into the MSA as "purchased services," or treated as stand-alone development projects, the OASIS database, remote auditor, and auditor scorecard was plainly not the sale of any off-the-shelf product.  The whole point of each project was to collaborate on developing something new that would add new functionality the consumer desired.  Similarly, the MSA as a whole focused on providing services, not off-the-shelf products, in the form of basic support, bulk time or purchased services.  To the extent the MSA generally, or any "purchased services" under the MSA or otherwise, included a "sale of goods," at all, it is plain that the predominant purpose of all the agreements was ongoing provision of services.  Accordingly, even if Jadian had tried to develop this theory earlier, the Court would have rejected it.  *See Pearl Investments, LLC v. Standard I/O, Inc.*, 257 F. Supp. 2d 326, 353 (D. Me. 2003).

23

The Court also agrees with NQA on the remaining points.  A request to reopen the trial record is committed to the court's "sound discretion." *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331 (1971).  Generally, a court in receipt of such a request "will not reopen a case for further evidence in the absence of any reason being given or showing made as to why the evidence sought to be presented was not obtained at a time when it could have been introduced during the trial."  35B C.J.S. Federal Civil Procedure § 982.  Regardless of whether the deposition testimony Jadian seeks to advance in the Corrected Proposed Supplement (ECF No. 147) is classified as rebuttal (as Jadian says it is and NQA says it is not), Jadian has not provided any reason or showing why it could not have introduced this evidence during trial.  Moreover, the additional deposition testimony that Jadian seeks to introduce is not particularly relevant to the matters at hand in any event.  For the same reasons, the Court also agrees with NQA that the affidavit of Cameron Reese should be struck.  Jadian's damages theory depends, in part, on the number of certificates issued by NQA, information that it says it has taken from NQA's website. Jadian questioned Mr. Passley about the certificates, but it did not seek to introduce the actual webpage into evidence at trial.  Jadian has not demonstrated why it could not have done so at that time.

In sum, the final pretrial conference was the time and place to bring these matters to the Court's attention, not in post-trial briefing.  The purpose of the latter is to wrap up and crystalize arguments based on the evidence introduced at trial.  Advancing entirely new arguments based on entirely new information is an end run around the purpose of the final pretrial conference and the time limits the Court imposed during the conference.  For these reasons, then, the Court sustains NQA's objections and grants the motion.  (ECF Nos. 148, 154, and 158).

## LEGAL STANDARDS

To establish a claim for breach of contract under Michigan law,[6] a plaintiff must prove by a preponderance of the evidence the following: "1) the existence of a contract between the parties; 2) the terms of the contract; 3) that defendant breached the contract; 4) that the breach caused the plaintiff injury." *Timmis v. Sulzer Intermedics, Inc.*, 157 F. Supp. 2d 775, 777 (E.D. Mich. 2001) (citing *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999)). Where "the contractual language is unambiguous, a court must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law." *In re Smith Trust*, 480 Mich. 19, 745 N.W.2d 754, 758 (2008) (citing *Frankenmuth Mut. Ins. Co. v. Masters*, 460 Mich. 105, 595 N.W.2d 832, 837 (1999)).

A breach is a violation or infraction of an obligation by failing to perform one's own contractual promise, by repudiating the promise, or by interfering with another party's performance. *Breach of Contract*, Black's Law Dictionary (8th ed. 2007). "Nonperformance of an obligation due is a breach of contract . . . ." *Woody v. Tamer*, 158 Mich. App. 764, 405 N.W.2d 213, 217 (1987). "The rule in Michigan is that one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." *Michaels v. Amway Corp.*, 206 Mich. App. 644, 650, 522 N.W.2d 703, 706 (1994) (internal quotation marks omitted); *see also McCarty v. Mercury Metalcraft Co.*, 372 Mich. 567, 573, 127 N.W.2d 340 (1964); *Chrysler Int'l Corp. v. Cherokee Export Co.*, 134 F.3d 738, 742 (6th Cir. 1998) ("He who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform."). The rule applies only when the initial breach is material, or substantial. *Michaels¸* 622 N.W.2d at 707.

---

[6] This is a diversity case, and both sides agree Michigan law applies under the MSA.

A "substantial breach" is a breach that "effect[s] such a change in essential operative elements of the contract that further performance by the other party is thereby ineffective or impossible, such as the causing of a complete failure of consideration or the prevention of further performance by the other party." *McCarty*, 372 Mich. at 574 (internal citations omitted). "To determine whether a substantial breach occurred, a trial court considers 'whether the nonbreaching party obtained the benefit which he or she reasonably expected to receive.'" *Able Demolition v. Pontiac*, 275 Mich. App. 577, 585, 739 N.W. 2d 696, 701 (Mich. Ct. App. 2007) (quoting *Holtzlander v. Brownell*, 182 Mich. App. 716, 722, 453 N.W. 2d 295 (1990)).

> Other considerations include the extent to which the injured party may be adequately compensated for damages for lack of complete performance, the extent to which the breaching party has partly performed, the comparative hardship on the breaching party in terminating the contract, the willfulness of the breaching party's conduct, and the greater or lesser uncertainty that the party failing to perform will perform the remainder of the contract.

*Omnicom of Michigan v. Giannetti Inv. Co.*, 221 Mich. App. 341, 348, 571 N.W.2d 128 (Mich. Ct. App. 1997) (citing *Walker & Co. v. Harrison*, 347 Mich. 630, 635, 81 N.W.2d 352 (1957)).

In the event of a substantial breach, the non-breaching party may terminate the contract. *Konos, Inc. v. California Farms, LLC*, No. 1:16-cv-624, 2018 WL 2739956, at *4 (W.D. Mich. Apr. 27, 2018) (citing *Convergent Grp. Corp. v. Cnty. of Kent*, 266 F. Supp. 2d 647, 655-56 (W.D. Mich. 2003); *Lynder v. S.S. Kresge Co.*, 45 N.W.2d 319, 325 (Mich. 1951)). The parties to a contract may also agree that before terminating the contract, the non-breaching party must provide notice and an opportunity for the breaching party to cure before bringing suit. *Id.* (collecting cases).

26

**DISCUSSION**

*1. Jadian Committed the First Substantial Breach*

The preponderance of the evidence points overwhelmingly to the conclusion that Jadian committed the first substantial breach of the MSA.  Jadian was in breach of the MSA before July 1, 2014—the date Jadian contends NQA breached the contract by failing to pay subscription fees on time—and NQA was within its contractual rights to terminate the contract.  This breach, furthermore, was substantial because Jadian's failure to perform the obligations set out in Section 3.1 amount to  "a change in the essential operative elements of the contract, such as a failure of consideration, or something that makes further performance by the other party ineffective or impossible." *Cherokee Export Co.*, 134 F.3d at 742 (6th Cir. 1998).

The factual record developed at trial demonstrates that in a short period of time following the acquisition of EQM and the MSA, Jadian repeatedly and consistently demonstrated it was unable to meet—under any commercially reasonable terms—the demands of NQA and the fundamental obligations of performance under the MSA.  The testimony and documentary evidence introduced at trial established a clear abandonment of responsibility on Jadian's part.  Jadian's failure to perform establishes a breach of contract under the clear language of the MSA, the third-party Escrow Agreement, and the understanding of all parties.

Under Section 3.1 of the MSA, Jadian was obligated to provide NQA with "basic support":

27

**3.1 Our Responsibilities.** We shall (i) provide to You basic support for the Purchased Services at no additional charge, and/or upgraded support if purchased separately, (ii) use commercially reasonable efforts to make the Purchased Services available 24 hours a day, 7 days a week, except for: (a) planned downtime (of which We shall give at least 8 hours notice via the Purchased Services and which We shall schedule to the extent practicable during the weekend hours from 9:00 p.m. Eastern time Friday to 12:00 a.m. Eastern time Monday), or (b) any unavailability caused by circumstances beyond Our reasonable control, including without limitation, acts of God, acts of government, flood, fire, earthquakes, civil unrest, acts of terror, strikes or other labor problems (other than those involving Our employees), or Internet service provider failures or delays, (iii) at Our expense, use all reasonable commercial endeavors to correct any critical non-conformance promptly, or provide You with an alternative means of accomplishing the desired performance. If such non-conformance is caused by Your use of the Purchased Services contrary to instructions, or modification or alteration of the Purchased Services by any party other than Us, You will be responsible for the cost to correct such non-conformance, (iv) credit Your account as described in Section 5.3 (Credits) if such non-conformance substantially degrades or limits the functionality of the Purchased Services and (iv) provide the Purchased Services only in accordance with applicable laws and government regulations.

Shaun Passley agreed during his testimony that as part of the MSA, Jadian would provide basic support at no additional charge. Testimony at trial, furthermore, established that basic support centered around bringing the EQM software back to "baseline" when it crashed or otherwise went offline. Basic support also involved less critical issues, including issues isolated to a single audit or client.

Before July 1, 2014—the earliest possible date Jadian identifies that NQA could have been in breach of the MSA[7]—Jadian totally failed at meeting its obligation to provide basic support. This is most clearly shown in its failure to provide basic support for the invoicing email issue that NQA first reported on May 14, 2014. Glitches and crashes with EQM were nothing new, but Jadian's response illustrated how the transfer had been fumbled. When NQA reported the invoicing issue, Guy Metz was unable to provide a timely fix. Mr. Metz developed the EQM software, but he had no experience providing day to day basic software support. This support had been provided by Enterprises employees who did not become Jadian employees. When days passed with no fix, NQA brought on Bill Allison to provide the "instrumental" fix.

---

[7] This was the date that Jadian contends NQA first used the EQM software without paying the subscription fee. Subsequent alleged breaches, including Mr. Dressler's alleged repudiation and NQA's alleged improper use of the EQM source code, occurred later.

Around the same time, and before July 1, 2014, Jadian was failing at providing basic support to other requests submitted by NQA. As laid out above, before July 1, 2014, Jadian failed to provide a fix for the IAAR upload issue and, indeed, it never provided a fix for the problem. Mr. Theobald's request for a view—also made in May 2014—also went unfulfilled until NQA brought on Joseph Nagel and assigned him to provide the data summation. Joseph Nagel's unrebutted testimony at trial, furthermore, was that Mr. Theobald's request for the view fell within a request for basic support. All told, this level of support from Jadian in the weeks before July 1, 2014 was not the benefit which NQA reasonably expected to receive under the MSA.

Jadian's argument that it did not breach the contract, or that if it did it was not a material or substantial breach, fails to convince the Court. The argument depends mostly on the unsupported testimony of Shaun Passley. Mr. Passley repeatedly was non-responsive and evasive on questions that were concise and clearly presented. Those answers he did provide were vague and, based on the Court's personal observations during trial, were intentionally nebulous even on non-controversial issues. The gist of Jadian's argument is that the failure to provide a fix to the invoices was not a substantial breach because it was compensable by money damages, that it was making commercially reasonable efforts in the meantime, and that the issues NQA complains about were eventually fixed. But the invoicing issue was only part of a pattern of events before July 1, 2014 where Jadian demonstrated a basic incapacity to provide any meaningful support for EQM. Providing support to NQA on the software was plainly essential to NQA. The unrebutted trial testimony was that EQM needed constant care, maintenance and support. And the series of events in the weeks following the acquisition bears that out. Mr. Passley's testimony was not credible.

Jadian's plan for support was to bring on additional developers. Plainly this was unworkable and could not amount to the support sufficient to confer the benefit NQA reasonably expected to receive because there was no one to train those developers on how to provide basic support. Guy Metz and Jerry Norris had no experience providing such support. And even if the developers could, at some point, have been brought up to speed, Jadian's plan to tide things over was insufficient. For example, in order to send out the invoices, Jadian (through Shaun Passley) suggested at trial that NQA should have provided its own support and manually send the invoices. This is hardly a reasonable commercial endeavor to make EQM available to NQA.

Jadian's argument that the failure to provide support for the email invoices was insubstantial because Bill Allison provided a fix is illogical. The testimony at trial established that these invoices amounted to over a million dollars' worth of revenue—hardly an inconsequential amount. And Bill Allison was working for NQA—not Jadian—when the invoicing issue was fixed. In other words, NQA stepped in to provide its own fix when Jadian failed to perform. This does nothing to demonstrate the breach was immaterial. To the contrary, it only goes to show that Jadian was incapable of performing basic support.

For all these reasons, then, the Court concludes that Jadian committed the first material breach of the contract. Accordingly, NQA is entitled to judgment in its favor on Jadian's contractual claims. *See Chrysler Intern. Corp.*, 134 F.3d at 742 (quoting *Ehlinger v. Bodi Lake Lumbar Co.,* 324 Mich. 77, 36 N.W.2d 311, 316 (1949)) ("He who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform.

2.  *NQA's Action for Breach of Contract*

For the same reasons that Jadian's breach of contract claims fail, the Court finds that NQA is entitled to judgment in its favor on its breach of contract counterclaims.  There was a contract between NQA and Jadian: the MSA.  The terms of the contract required Jadian to provide basic support to NQA, as well as bulk time and separately purchased services.  Jadian breached that agreement by failing to provide the agreed services before NQA ceased payment on its invoices.  And the breach caused NQA injury.  In lengthy post-trial briefing, however, Jadian disputes whether NQA may maintain its breach of contract counterclaims.  In the main, Jadian says this is so because NQA failed to follow the notice and cure obligations set out in Section 11.3 of the MSA.  That provision states:

> **11.3. Termination for Cause.** A party may terminate this Agreement for cause: (i) upon 30 days written notice to the other party of a material breach if such breach remains uncured at the expiration of such period, or (ii) if the other party becomes the subject of a petition in bankruptcy or any other proceeding relating to insolvency, receivership, liquidation or assignment for the benefit of creditors.

Jadian says NQA never terminated the agreement in a manner consistent with the parties' agreement.  Specifically, it contends that the notices by Mr. Dressler in July 2014 did not terminate the agreement. The Court disagrees.  Indeed, in its post-trial brief, Jadian states that in those same letters Mr. Dressler repudiated the MSA.  (ECF No. 153, PageID.2576).  Jadian's own position shows that it understood by Mr. Dressler's letters that NQA was clearly and unambiguously calling the whole thing off.[8]  For this reason, Jadian's argument that notice was ineffective fails.  *See Wells v. 10-X Mfg. Co.*, 609 F.2d 248, 256 (6th Cir. 1979) ("[U]nder the law of Michigan a notice to rescind or terminate a contract must be clear and unambiguous, with the unquestionable purpose of insisting on the recission."); *see also SEE, Inc. v. See Concept SAS*, No. 16-13261, 2017 WL

---

[8] *See* FRED ASTAIRE & GINGER ROGERS, LET'S CALL THE WHOLE THING OFF, *in* SHALL WE DANCE (RKO Radio Pictures, Inc. 1937).

31

768616, at *3 (E.D. Mich. Feb. 28, 2017) ("For a notice of breach to be effective, it must objectively put the allegedly breaching party on notice that a cure period is being triggered and that drastic legal repercussions will result from a failure to cure.") (internal citations, quotations marks, and alterations omitted).

Accordingly, the Court is satisfied by a preponderance of the evidence that NQA terminated the agreement and has established that Jadian breached the MSA.

   *3.  The Escrow Agreement*

Because NQA has established Jadian breached the MSA, it had a proper basis for requesting the EQM source code under the Escrow Agreement with Iron Mountain.   There is no dispute that the Escrow Agreement was assigned to Jadian.   There further is no dispute that this Agreement was provided to Jadian by Enterprises during the acquisition.

As set out above, under Exhibit C of the Agreement with Iron Mountain, NQA could request that Iron Mountain release the source code on the occasion of one or more specified conditions, including breach of the underlying agreement governing the EQM software:

1.  Release Conditions.  The Depositor and Beneficiary agree that a Work Request for the release of the Deposit Material shall be based solely on one or more of the following conditions (defined as "**Release Conditions**"):
      (i) Depositor's breach of the license agreement or other agreement between the Depositor and the Beneficiary regulating the use of the Deposit Material covered under this Agreement; or
      (ii) Failure of the Depositor to function as a going concern or to operate in the ordinary course; or
      (iii) Depositor is subject to voluntary or involuntary bankruptcy.

Once requested, a Notice would be sent by Iron Mountain to the depositor's—Enterprises, and then Jadian's—authorized person:

2.  Release Work Request.  A Beneficiary may submit a Work Request to Iron Mountain to release the Deposit Material covered under this Agreement.  Iron Mountain will send a written notice of this Beneficiary Work Request within five (5) business days to the Depositor's Authorized Person(s).

Absent any instructions to the contrary, Iron Mountain was to release the source code:

4. Release of Deposit Material.  If Iron Mountain does not receive Contrary Instructions from an authorized Depositor representative, Iron Mountain is authorized to release Deposit Material to the Beneficiary or, if more than one Beneficiary is registered to the deposit, to release a copy of Deposit Material to the Beneficiary.  Iron Mountain is entitled to receive any undisputed, unpaid Service Fees due Iron Mountain from the Parties before fulfilling the Work Request to release Deposit Material covered under this Agreement.  Any Party may cure a default of payment of Service Fees.

The undisputed trial record demonstrates that NQA made a request to Iron Mountain for the release of the EQM source code in September 2014.  It is also undisputed that Iron Mountain sent a notice to the Authorized Person it had on file: Kim Griggs:

DEPOSITOR – AUTHORIZED PERSON(S)/NOTICES TABLE

Provide the name(s) and contact information of the Authorized Person(s) under this Agreement.  All notices will be sent to the person(s) at the address(es) set forth below. This is required information.

| COMPANY: | JADIAN ENTERPRISES, INC |
| ADMINISTRATIVE CONTACT PRINT NAME: | Kim Griggs |
| TITLE: | VP Corporate |
| EMAIL ADDRESS: | kimg@jadian.com |
| ADDRESS 1 | 1800 N. Grand River Ave |
| ADDRESS 2 | Suite 5 |
| CITY/STATE/PROVINCE | Lansing MI |
| POSTAL/ZIP CODE | 48906-6200 |
| PHONE NUMBER | 517-639-0410 |
| FAX NUMBER | 866-285-3676 |

It was, furthermore, understood by the plain terms of the Escrow Agreement that all sides had the right to rely on the last known address of the other parties:

(h) Notices.  All notices regarding Exhibit C (release) shall be sent by commercial express mail or other commercially appropriate means that provide prompt delivery and require proof of delivery.  All other correspondence, including invoices, payments, and other documents and communications, may be sent electronically or via regular mail.  The Parties shall have the right to rely on the last known address of the other Parties.  Any correctly addressed notice to last known address of the other Parties that is relied on herein and that is refused, unclaimed, or undeliverable because of an act or omission of the Party to be notified as provided herein shall be deemed effective as of the first date that said notice was refused, unclaimed, or deemed undeliverable by electronic mail, the postal authorities by mail, through messenger or commercial express delivery services.

Jadian does not contend that it ever provided an updated address to Iron Mountain for notice to be sent even though the above language made clear that it was incumbent on each side to provide Iron Mountain with any updated information with respect to an Authorized Person.

33

Following the release of the source code to the beneficiary—that is, NQA—the Escrow Agreement provided that NQA would have the right to use the EQM source code:

6.  <u>Right to Use Following Release</u>.  Beneficiary has the right under this Agreement to use the Deposit Material for the sole purpose of continuing the benefits afforded to Beneficiary by the License Agreement.  Notwithstanding, the Beneficiary shall not have access to the Deposit Material unless there is a release of the Deposit Material in accordance with this Agreement.  Beneficiary shall be obligated to maintain the confidentiality of the released Deposit Material.

Based on Jadian's breach of the MSA, NQA was within its rights under the Escrow Agreement to request the EQM source code from Iron Mountain.  And once NQA received the source code, it was able to use the source code to continue the benefits of the "mission critical" EQM software.  Yet, for a number of reasons, Jadian avers that NQA is not using the EQM software in a manner consistent with the MSA and Escrow Agreements and, it says, must pay subscription fees for the use of the EQM software.  Assuming, *arguendo*, Jadian may raise these arguments despite having committed the first substantial breach of the MSA, the Court finds Jadian's arguments meritless.

First, as set out above, the MSA was terminated by NQA in 2014.  Thus Jadian's argument that NQA owes subscription fees because the MSA is still in effect fails.  Similarly, Jadian's argument that NQA failed to comply with the Escrow Agreement because it did not send notice to Jadian runs contrary to the plain language of the agreement.  Under the unambiguous plain language of the Escrow Agreement, Iron Mountain—not NQA—was to send the notice, and the parties agreed that they could rely on the last known address of each side.  Jadian does not provide a persuasive reason as to why it should escape the contractually agreed to consequences of its failure to keep Iron Mountain apprised of the change of circumstances.

Furthermore, even if the U.C.C. does apply, as Jadian avers for the first time in post-trial briefing, and even if the U.C.C. would require that Jadian actually receive notice, as Jadian appears to suggest, the Court is unconvinced it should rewrite the unambiguous terms of the Escrow

Agreement.  *See Callidus Capital Corp. v. FCA Group*, No. 14-10484, 2018 WL 1577079, at *12 (E.D. Mich. Mar. 30, 2018) (rejecting the plaintiff's argument that parties could not contract around U.C.C. notice requirement).

Still, Jadian contends NQA must continue to pay subscription fees even if it was permissible for NQA to receive the source code under the Escrow Agreement.  The Court disagrees.  The MSA was terminated, for one thing.  Moreover, the plain language of the agreements, as well as the course of events in this case, demonstrates that NQA was entitled to use the source code if there was a failure to perform.  The trial record demonstrates that Jadian abandoned its obligations to provide basic support to NQA for the EQM software, and also failed to deliver purchased services.  NQA had to step in and provide its own fix to obtain the benefits that Jadian had promised to provide.  Jadian's position, distilled down to its basic understanding, is that it could let NQA do the work of providing support to the EQM software, hiring the staff and spending the time and resources in order to make things work, sit back for three years, and then recover subscription fees for the intervening period.  This reasoning recalls to mind the story of *The Little Red Hen* and enjoys no support either in the language of the MSA, the Escrow Agreement, or the law.

Jadian also says that fees are owed under Section 11.5 of the MSA, which provides for certain surviving provisions post termination; the U.C.C.; and the Restatement Second, of Contracts.  The Court disagrees.  The parties had the Escrow Agreement for this purpose and under that agreement, the parties agreed that NQA could use the EQM source code, so long as it was within the scope of its business.[9]

---

[9] Jadian contends that NQA is not using the source code within the scope of its business and is violating the MSA's non-confidentiality provisions by working with CABEM Technologies, Inc., a software development company.  According to NQA, CABEM is working with NQA to provide

### 4.  A Total Failure of Proof on Damages

Even if Jadian could succeed on any contractual theory of liability, the Court concludes that Jadian has failed to establish damages necessary to make out its breach of contract claim.  This is so for several reasons.  First, there was a total failure of proof at trial on the theory of damages that Jadian disclosed under Rule 26 during discovery.  The theory that was disclosed under the rule sought damages for $473,442.57 in unpaid invoices, $371,147.70 in additional license fees, and $4,678,397.88 for developing the source code.  But Jadian did not pursue this theory at trial during its case in chief.  Mr. Passley repeatedly stated that the figures and theories had been "amended" or "modified."  In fact, Jadian does not rely on these amounts in its trial briefing.  But this simply confirms that there was a total failure of proofs on the disclosed damages theory.  No expert was called, nor was anything other than Mr. Passley's unsupported and non-credible contentions presented.[10]  And whatever amendment or modification Mr. Passley thought occurred was never timely under Rule 26, or any other Court rule or order of the Court.  This is wholly insufficient to satisfy Jadian's burden.

---

EQM software development and support to NQA—the support that Jadian failed to provide to NQA during the parties' relationship.  Jadian avers, however, that NQA has violated the confidentiality provisions of the MSA by giving the source code to CABEM and, furthermore, CABEM is creating derivative works based off the EQM source code.  CABEM is not a part of this case, and so to the extent that Jadian asserts that CABEM has misappropriated its trade secrets and is using the source code to create derivative works, that claim is not a part of this case.  The Court is satisfied, moreover, that NQA has not violated the MSA by receiving the source code and using CABEM to provide technological support.  That was the whole point of the Escrow Agreement.

[10] On cross examination, Shaun Passley testified that he determined the above listed amounts.  The costs for developing source code, for example, was based on his calculation of the "man hours" that employees at Enterprises and GSC Mobile Solutions spent developing the software.  The license fees were also determined by Mr. Passley using formulas in an excel spreadsheet that was not a part of the trial record.

At trial, and in post-trial briefing, Jadian attempted to pivot to an entirely separate theory of damages. This was first presented in a Supplemental Damages Disclosure on May 10, 2019. (ECF No. 129-2). There Jadian sought $2.8 to 3.4 million under the MSA and EQM subscription formula; approximately $1.4 million for software development; as well as interest and attorney fees. (*Id.*). These amounts and theories were not—during discovery or even prior to summary judgment—disclosed to NQA. Rather they were filed as part of Jadian's response to NQA's motion in limine on damages and, Jadian says, are meant to cure any "technical deficiency." It furthermore avers that any nondisclosure here is harmless. The Court disagrees. This is no mere technical deficiency, but rather a complete shift in the claimed basis for recovery. The total amounts sought in the supplemental disclosure may be in the same ballpark as the amounts in the initial disclosure, but that is the only similarity between the two theories at least to the extent it is possible to find an evidentiary basis for either theory. Indeed, Jadian failed to provide the "critical piece" of its damages theories to NQA so that NQA could fill in the puzzle. *See Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 369 (6th Cir. 2010). For example, Jadian did not explain what was meant by additional license fees. By Shaun Passley's own account at trial, the excel spreadsheet was not provided to NQA until after discovery had been completed.

The federal rules do not permit this type of sandbagging. *See id.* Indeed FED R. CIV. P. 26(a)(1)(A)(iii) provides that, "a party must, without awaiting a discovery request, provide to the other parties . . . a computation of each category of damages claimed by the disclosing party." So, when a party "fails to provide information ... as required by Rule 26(a)," a party is "not permitted to use that ... information ... at a trial unless the failure was substantially justified or is harmless." FED.R.CIV.P. 37(c)(1). To be sure, amounts and other things can shift during the course of litigation. *See Gonzalez v. Ford Motor Co.*, No. 1:12-cv-535, 2014 WL 6895787, at *4-*5 (S.D.

Ind. Dec. 5, 2014) (finding the plaintiff was not required to produce a "precise computation" of the compensatory and punitive damages the plaintiff sought to recover, but prohibiting the plaintiff from suggesting a specific amount to the fact finder where the computation had not been produced during discovery).  Even then, Jadian was still required by rule to provide a computation before the end of discovery.  *See HLV, LLC v. Page &* Stewart, No. 1:13-cv-1366, 2018 WL 2214811, at *2 (W.D. Mich. Mar. 27, 2018) (Maloney, J.); *see also* FED. R. CIV. P 26(e)(1)(A).

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."  *Id.* (citing FED. R. CIV. P. 37(c)(1)).  Courts within the Sixth Circuit consider five factors when determining whether a failure to disclose is substantially justified or harmless under the rule: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the party would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (quoting *Russel v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396-97 (4th Cir. 2014)).  Here the factors weigh against finding the nondisclosure harmless or substantially justified.  Discovery in this matter had long since closed when the supplemental disclosure first came up.  And while Jadian avers that NQA "always knew" it had to pay these types of fees and could calculate its liability based on the information it had on hand, this is true only if Jadian provided the critical pieces of the puzzle and basic theory as part of its disclosures.  It did not do so.  Rule 26 requires not only a computation of each category of claimed damages, must also the "documents or other evidentiary material . . . on which each

computation is based."  Here, Jadian utterly failed to do so with respect to its supplemental damages theory.  For this reason, the Court grants NQA's motion in limine on damages.

But even if the Jadian theory of damages that was presented at trial is considered, the Court concludes that it has not been established by a preponderance of the evidence.  In its post-trial brief, Jadian primarily seeks EQM license fees that it says it is owed under the MSA.  Jadian's theory is that it provided "Level 3" implementation for NQA's subscription.  Under the schedule on the subscription form between NQA and Enterprises for the EQM software subscription, Jadian avers NQA agreed to pay $31,000 for the first 10,000 audit days, and $5 per audit day thereafter. Jadian avers the Court may take judicial notice of Jadian's website to determine the amount of certificates NQA has used up until present.  It contends that from this, the Court may determine the amount of audit days.  All told, Jadian avers in its post-trial brief that the amount of subscription fees NQA owes is $3,125,500.  Again, this contention is barred by the Escrow Agreement and the termination of the MSA.  But even if it was not, the Court finds Jadian failed to establish an evidentiary or legal basis for recovery.   Jadian provided no services whatsoever to NQA under the MSA at least from July 2014.  Jadian cannot sit still for three years and then bring suit in October 2017 seeking subscription fees for the entire intervening period.

The same concept precludes the second supplemental theory of recovery: namely, that Jadian is owed the amounts that NQA is paying to CABEM for software development and support fees as well as the amount NQA is paying to Joseph Nagel to do work on EQM.  Again, Jadian provides no theory for why it should recover on the amount that NQA is spending to provide its own support.  These are not fees that NQA agreed to pay Jadian under the MSA.  To the contrary, they are expenses NQA has incurred because Jadian failed to fulfill its own contractual commitments.

Finally, because Jadian has not established a breach of the MSA and fails for multiple reasons to establish damages, there is no basis for recovery of late fees or attorneys fees.

   5. *NQA's Damages*

The remaining matter is on NQA's damages on its breach of contract theory. NQA requests a total of $60,150 consisting of $58,350 that it prepaid to Enterprises on the three development projects, as well as the $1,800 it paid to Bill Allison for his work on the EQM email invoicing issue. Jadian resists these amounts. It contends that the three projects are not a part of the MSA and that, notwithstanding any assurances it may have provided after the transition, nothing in Epazz's acquisition of Enterprises obligated it to complete work on the projects or deliver them to NQA. It contends the claim is barred by the statute of limitations in any event. With respect to the payment to Bill Allison, it says it never agreed to pay for Bill Allison's time.

The Court grants NQA's request in part. With respect to the costs incurred for payment to Bill Allison, the Court agrees with Jadian that these costs are barred under the MSA as incidental damages. Section 10.2 of the Agreement provided:

**10.2. Exclusion of Consequential and Related Damages.** IN NO EVENT SHALL EITHER PARTY HAVE ANY LIABILITY TO THE OTHER PARTY FOR ANY LOST PROFITS OR REVENUES OR FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, COVER OR PUNITIVE DAMAGES HOWEVER CAUSED, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, AND WHETHER OR NOT THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE FOREGOING DISCLAIMER SHALL NOT APPLY TO THE EXTENT PROHIBITED BY APPLICABLE LAW.

NQA articulates its theory here as that "Jadian breached the MSA and that breach caused NQA to suffer damages in the amount of $1,800, the amount that NQA paid Allison to provide the fix to the invoicing problem." This theory of recovery is proscribed by the plain language of Section 10.2 of the MSA. While NQA references Section 3.1 of the Agreement, that section says nothing about damages. Rather it provides that Enterprises, and then Jadian, would use, at its expense, all reasonable commercial endeavors to correct certain non-performances. This language sets out what may amount to a breach, but it says nothing about damages from that breach. Here the parties

40

contractually agreed that the incidental damages would not be covered, and the Court sees no basis for finding that the payment to Bill Allison falls outside this contractual agreement.

The $58,350 that NQA prepaid to Enterprises is a different matter.  These projects were on separate purchase orders that fall within the terms of "purchased services" under the MSA.  The integration clause of the MSA (Section 13.8) expressly picked up the "Order Forms" as part of the parties' agreement.  Moreover, both before and after the Epazz/Jadian acquisition, all parties treated these three development projects as part of the contractual commitment to NQA.   The meeting notes consistently document Jadian's efforts to continue work on the projects; give updates to NQA; and to provide assurances that the projects would be eventually delivered.  There is no question that Jadian was responsible for delivering the development projects under the contract.  *See Antiphon, Inc. v. LEP Transport, Inc.*, 183 Mich. App. 377, 384 (Mich. Ct. App. 1990) (noting exception to general rule that a successor in exchange of cash for assets is not liable for the predecessor's liability "where the conduct or representations relied upon by the party asserting liability indicate an intention on the part of the buyer to pay the debts of the seller.").

The unrefuted testimony at trial established that NQA paid Enterprises $58,350 for these development projects.  The Court has further concluded by a preponderance of the evidence that these projects were never delivered to NQA.  The Court concludes that NQA has established it is entitled to recover this amount, at a minimum.  *See Corl v. Huron Castings, Inc.*, 450 Mich. 620, 625-626, 544 N.W.2d 279, 280 (1996) ("[T]he goal in contract law is . . . to make the nonbreaching party whole.").  A refund of pre-paid amounts for projects may not fully account for the legitimate expectation interests of NQA, but a refund combined with the release of the source code under the Escrow Agreement does.

Finally, Jadian avers that NQA cannot recover on these amounts because it is untimely under the statute of limitations.  It notes that the Counterclaims were first brought in March 2018. Jadian contends that the applicable statute of limitations is four years under the Uniform Commercial Code, and that trial testimony established that all three development projects were due before the four-year lookback.  In response, NQA asks the Court to find that Jadian has waived the defense because it was not included in its Answer to the Counterclaim.  (ECF No. 70, PageID.832).  Jadian does not dispute that it failed to plead the defense, but it notes that commentators have found that "[e]ven as late as trial, if evidence relating to an unpleaded affirmance defense is introduced without objection, Rule 15(b) requires the pleadings to be treated as if they actually had raised the defensive issue."  5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1278 (3d ed. 2004).

The Court rejects the limitation defense.  In the first place, Jadian waived it by failing to plead it as an affirmative defense.  This is not a case of a harmless omission that the Court can forgive based on trial evidence for all the reasons recited earlier in granting NQA's motion to strike.  In short, Jadian cannot make a fundamental change in theory—whether pivoting to a new damage claim, or developing a new legal theory regarding applicable law—in post-trial briefing.

Even if the Court were to find a basis to excuse Jadian's failure to raise the defense, the Court is unpersuaded that the statute of limitations in the U.C.C. applies to bar NQA from recovering here.  Citing to *Dahlmann v. Sulcus Hosp. Techs Cop.* 63 F. Supp. 2d 772, 775 (E.D. Mich. 1999), and the predominant factor test for applying the U.C.C. to mixed goods and services contracts, Jadian avers that the software development in this case is a "good" and thus the four year statute of limitations applies.  In *Dahlman*, the plaintiffs entered into contracts for the purchase of a property management software system.  The agreement included certain ongoing

42

obligations for support, training, and installation.  The Court found the services to be incidental to the "good," that is the property management system, and concluded that the agreement at issue related to the sale of goods, thus implicating the U.C.C.  This case is distinguishable.  In *Dahlman*, the software package already existed.  In this case, the software that NQA was requesting did not yet exist.  All three projects required Enterprises, and then Jadian, to develop new applications for EQM.  Moreover, the whole relationship between NQA and Enterprises was, in effect, a collaborative strategic partnership that required daily interaction with the software code to provide stability and functionality.  There never was an off-the-shelf product involved, and the failure of Jadian to recognize that contributed to the almost immediate collapse of the business relationship in the wake of the asset sale.  The Court sees this case to be more on point with that of *Pearl Investments, LLC v. Standard I/O*, 257 F. Supp. 2d 326, 353-54 (D. Me. 2003).  That case held that "development of a software system from scratch primarily constitutes a service."  *Id.* at 353 (collecting cases).  The Court agrees with this analysis and, accordingly, concludes that the U.C.C. does not apply to these project agreements.

Finally, even assuming the U.C.C.'s four-year limitations period applied, it would not bar the claim here.  Both Enterprises and Jadian failed to deliver the projects at the originally promised dates—or at any time.  But NQA continued to work with both Enterprises and Jadian past March of 2014 on all three projects.  NQA's claims for failure to deliver these projects did not accrue before the business relationship failed in the summer or fall of 2014.  So whether under the U.C.C., or under Michigan's general six-year limitations period, MICH. COMP. LAWS § 600.5807(8), the claims were timely.

For all these reasons, then, the Court concludes that NQA is entitled to damages in the amount of $58,350—the amount it prepaid for the three projects that Jadian never delivered.

43

## CONCLUSION

For the reasons set forth above, the Court finds that Defendant National Quality Assurance USA, Inc., did not breach the Master Subscription Agreement and that Jadian did breach the agreement.  Based on the foregoing, the Court will enter judgment in favor of NQA and against Jadian under Counts I and V of the Corrected Complaint and with respect to Count II of the Amended Counterclaim.

Furthermore, for the reasons set out above, **IT IS ORDERED** that:

1. NQA's Motion in Limine to Exclude Evidence of Certain Purported Damages (ECF No. 124) is **GRANTED.**

2. NQA's Objections to Jadian's Supplement to the Final Pretrial Order (ECF No. 148) and to Jadian's Post-Trials Brief (ECF No. 154) are **SUSTAINED.**

3. NQA's Motion to Strike the Affidavit of Cameron Reese (ECF No. 158) is **GRANTED.**

4. A Judgment consistent with this Opinion shall enter.


Dated:    June 10, 2020           /s/ Robert J. Jonker
                                  ROBERT J. JONKER
                                  CHIEF UNITED STATES DISTRICT JUDGE